[Crim. No. 1990. In Bank.—May 1, 1916.]

## THE PEOPLE, Respondent, v. KOSTA KROMPHOLD, also Known as JOHN W. McLARNEY, Appellant.

CRIMINAL LAW — CHANGE OF PLACE OF TRIAL — INABILITY TO SECURE FAIR TRIAL—DISCRETION OF TRIAL COURT.—A defendant's application in a criminal case, under section 1033 of the Penal Code, for a change of the place of trial on the ground that a fair and impartial trial cannot be had in the county, is addressed somewhat to the discretion of the trial court; such discretion, however, not being a mere arbitrary discretion, but one the exercise of which must be reasonable. If the conclusion of the trial court finds reasonable support in the record, it must be sustained, even though an appellate court might feel better satisfied had the motion been granted. In the present case there was no abuse of discretion in refusing to grant the application.

ID.—DEFERRING DETERMINATION OF APPLICATION UNTIL AFTER IMPANELMENT OF JURY.—The court may defer final action on such an application pending efforts to obtain a fair and impartial jury, and proceedings in the impanelment of the jury in so far as they throw light on the question whether a fair and impartial trial can be had in the county, may be taken into consideration.

ID.—JURY—CHALLENGE FOR CAUSE—ERROR IN DISALLOWING—APPEAL— EXHAUSTION OF PEREMPTORY CHALLENGES.—Alleged error in disallowing the defendant's challenge for cause to a juror who did not serve on the trial because excused on a peremptory challenge will not be reviewed on appeal, notwithstanding the defendant ex-

hausted all of his peremptory challenges, where it does not appear that he desired to exercise any additional challenge, or that he had any objection to any juror sworn to try the cause, or any disposition to have any such juror excused.

ID.—EVIDENCE—LEADING QUESTIONS—DISCRETION.—The matter of allowing leading questions is one almost entirely within the control of the trial court, and there was no abuse in doing so in this case, where the testimony objected to, which was elicited on redirect examination, was in substance a mere repetition of matter stated by the witness both on direct and cross examination.

ID.—INSTRUCTIONS—DEFINITIONS OF DEGREES OF MURDER.—An instruction which clearly and accurately defines the two degrees of murder is not subject to the criticism that it defines murder of the first degree as "including all murders of a cruel and aggravated character," merely because it contains the expression that "in dividing murder into two degrees, the legislature intended to assign to the first, as deserving of greater punishment, all murders of a cruel and aggravated character, and to the second all other kinds of murder which are murder at common law."

ID.—MISCONDUCT OF DISTRICT ATTORNEY—APPEAL.—Statements made by the district attorney on the trial cannot be reviewed on appeal as misconduct, where they were not objected to at the trial, or assigned as misconduct, or in any way called to the attention of the trial court.

ID.—ARGUMENT OF DISTRICT ATTORNEY.—On a trial for murder, it cannot be held to exceed the limits of proper argument for the district attorney, in the course of his argument, to state, referring to the defendant: "Where, I say, where can you find sympathy or one drop of mercy for such a man, such a wicked man, and possessed with such a depraved heart?"

ID.—FAILURE OF DEFENDANT TO TESTIFY—COMMENT BY DISTRICT ATTORNEY — CAUTION BY JUDGE — UNPREJUDICIAL ERROR.— In view of the provisions of section 1323 of the Penal Code, it is error for the district attorney, in his argument to the jury, to comment on the failure of the defendant to testify upon any subject connected with the trial, although he may have been a witness and may have testified on other subjects. Such error, however, will be deemed unprejudicial, and not to have resulted in a miscarriage of justice within the meaning of section 4½ of article VI of the constitution, where the trial court, on objection by the defendant, promptly cautioned the district attorney not to comment on the defendant's omission to testify to any particular fact, and to be extremely careful in that respect.

ID.—IMPEACHMENT OF VERDICT—AFFIDAVIT OF JUROR.—The affidavit of a juror cannot be received to impeach the verdict except where it is the result of a resort to the determination of chance, and the

same policy which prohibits a juror from impeaching his verdict by his affidavit prevents such impeachment by statements made by the juror to others.

APPEAL from a judgment of the Superior Court of Yuba County, and from an order refusing a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

Charles A. Wetmore, and E. B. Stanwood, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

ANGELLOTTI, C. J.—Defendant was charged by information filed in the superior court of Yuba County on September 13, 1915, with the crime of murder, in the unlawful killing of one John B. Sperbeck on September 6, 1915. On his trial, which was commenced on October 13, 1915, he was found guilty of murder in the first degree, and was adjudged to suffer death. He appeals from the judgment and from an order denying his motion for a new trial.

1. The principal point made for reversal is that the court erred in refusing to grant defendant's motion for a change of place of trial, based on the ground that a fair and impartial trial could not be had in Yuba County (secs. 1033–1035, Pen. Code). The motion was made just prior to the commencement of the trial, and affidavits were presented in support thereof and counter-affidavits were presented by the state. The trial court expressed itself as not satisfied from the showing made that a fair and impartial trial could not be had in Yuba County, and, following a practice that has been approved by this court, denied the motion for the time being, with the right to the defendant to renew the same after the proceedings in the matter of impaneling a jury had progressed to such a point as to throw further light on the question. (*People* v. *Plummer,* 9 Cal. 298, 309; *People* v. *Goldenson,* 76 Cal. 328, [19 Pac. 161]; *People* v. *Fredericks,* 106 Cal. 554, [39 Pac. 944]; *People* v. *Staples,* 149 Cal. 405, 412, [86 Pac. 886].) Counsel for defendant state that the motion was twice renewed and denied. The record shows that just before the last juror was sworn to

try the case, on October 15, 1915, the motion was formally renewed, counsel saying, "Before the juror is sworn in, I would like to renew our motion for a change of venue in this case." No showing in addition to that made at the commencement of the trial was attempted, and the court denied the motion. It is not claimed that on the previous renewal of the motion alleged to have been made, any additional showing was presented. The formal renewals of the motion were made simply for the purpose of preserving defendant's rights on the showing made at the commencement of the trial, it having been held in the cases above cited that where the original motion is denied with leave to renew, a failure to renew is a waiver of the motion. The learned judge said in finally denying the motion: "I will state in denying the motion that it is apparent to the court from the testimony in the examination of the jurors that there has been no especial difficulty, no greater difficulty in securing this jury than is customary in other cases that come before the court, other criminal actions; and the court is satisfied that the jury obtained is an absolutely fair and impartial jury, and therefore there is no reason existing for the granting of a motion for a change of venue. . . . The court finds, as a matter of fact, that there has been no wide prejudice against the defendant that would preclude him from having a fair and impartial trial, and that is the reason for denying the motion for a change of venue. If the court had any doubt in the matter at all, it would grant the motion."

Section 1033 of the Penal Code provides that a criminal action may be removed from the court in which it is pending on application of the defendant, "on the ground that a fair and impartial trial cannot be had in the county." Section 1035 provides that "if the court be satisfied that the representations of the applicant are true," such an order of removal must be made. It must be conceded, in view of the decisions, that such an application is addressed somewhat to the discretion of the trial court, such discretion, however, not being a mere arbitrary discretion, but one the exercise of which must be reasonable. The conclusion reached must be such as finds warrant "in the facts disclosed by the affidavits filed and in the circumstances made to appear in the record" (see *People* v. *Yoakum,* 53 Cal. 566). In *People* v. *Suesser,* 132 Cal. 631, [64 Pac. 1095], it was said by the

learned writer of the opinion that he admitted "that much discretion is left in this matter to the trial court." If the conclusion of the trial court finds reasonable support in the record, it must be sustained, even though an appellate court might feel better satisfied had the motion been granted. (*People* v. *Suesser*, 132 Cal. 631, [64 Pac. 1095].) And of course, in view of the well-established rule that final action on such a motion may be deferred by the trial court pending efforts to obtain a fair and impartial jury, the proceedings in the impanelment of the jury, in so far as they throw light on the question whether a fair and impartial trial can be had in the county, may be taken into consideration.

Certain facts are admitted. Yuba County is a small county, having only 10,042 inhabitants according to the last census. The deceased was a police officer of the city of Marysville. He had lived in Yuba County nearly all of his life. He had resided in different parts of the county, and had many relatives residing in various sections thereof. He had been a police officer in Marysville for five years, and was very popular both there and in the county. He was shot by defendant while he and Mr. Smith, city marshal of Marysville, were attempting to take defendant into custody as the probable perpetrator of a robbery that had just been committed in that city. The defendant was very shortly thereafter captured and placed in the city jail of Marysville. This occurred on September 6, 1915. There was naturally considerable excitement created in Marysville by the report of the shooting and consequent death of Sperbeck, and some manifestations of indignation, including expressions to the effect that defendant should be taken from the authorities and lynched. A large crowd of citizens assembled in the street in front of the jail, and many were there late into the night. The situation was such that it was deemed advisable by the authorities to place special policemen on guard at the jail during the night. The same night the city council, as a precautionary measure, ordered all saloons closed until the next afternoon at 5 o'clock. The two local papers of the next day contained reports of the affair, unfavorable, of course, to defendant, and one of these papers referred to defendant as an "assassin," confined awaiting arraignment "on a charge of committing the most dastardly, fiendish, and cowardly crime which has been perpetrated in this section

in years.'' These papers in publications made September 11th and 12th also contained statements to the effect that public sentiment favored as early a trial as possible, that public feeling against defendant was strong in Marysville and vicinity, that some of the authorities felt there would be difficulty in getting a jury, and that the panel would probably have to be drawn from remote portions of the county.

Affidavits filed in support of the motion alleged threats of violence and lynching on the day of the occurrence, and also a threat by two persons who visited defendant in the jail on September 9th. One affiant, a nonresident of the county who was in Marysville on September 6th, and again on September 16th, spoke of the excitement on the first day, ''the general talk . . . to the effect that the defendant should be hung or lynched,'' that he heard one man, who had a rope, say ''we will go into the jail and hang him,'' and others say ''we will lynch him,'' that there were expressions of hatred, etc., all the evening; also that on September 16th he talked with numerous people and heard many statements, ''which statements showed the universal prejudice, hatred, and bias held by the citizens of Yuba County toward the defendant,'' and that he heard men say that defendant ought to be hung or lynched. Another nonresident of the county had visited various places therein on October 5th, 6th, and 7th, and had heard therein much discussion of the case, indicating on the part of people generally extreme feeling against defendant and a desire that he be hanged. One of the attorneys of the defendant deposed that the almost universal expression of opinion, so far as he had heard the matter discussed, and he had heard it discussed a great deal, was that defendant was guilty and should be hanged.

There were counter-affidavits as to what occurred on September 6th, lending support to the conclusion that, although there was considerable excitement on the street, expressions indicating any desire to lynch defendant were confined to two or three isolated cases. It does not appear that any attempt was actually made to take defendant from the custody of the officers, or that such an attempt was even seriously threatened. And it is not intimated that after the first day there was made apparent any desire to proceed otherwise than in accord with law. Counter-affidavits filed further

bore upon the question of the existence of such prejudice as would prevent a fair and impartial trial in Yuba County. The remarks of the learned trial judge in refusing to grant the motion when it was first submitted indicate so clearly his conclusion, which we believe to have been sufficiently sustained by the showing made, that we quote them in full. He said:

"A motion like this is addressed to the discretion of the court. If the court is satisfied with the showing made that the defendant in any case could not receive a fair and impartial trial, there would not be any hesitancy on the part of the court in granting the motion. On the contrary, if the showing is insufficient to grant the motion, the only thing to do is to proceed with the impanelment of the jury, and if it should appear that the motion should be granted on the ground of bias and prejudice against the defendant in the community at large, as to prevent him from having a fair and impartial trial, the court would permit the motion to be renewed and it should unhesitatingly grant the motion for a change of venue. I am not satisfied with the affidavits but I am satisfied as to the statements of facts in the affidavits as to the sporadic assertions on the street such as: 'We ought to take him out and hang him' and 'If the jury doesn't convict him the death penalty will be inflicted—we ought to hang him.' The making of ill-considered remarks like that is not alone sufficient to satisfy the court that there is any such prejudice or bias shown throughout the county as should interfere with the defendant having a fair and impartial trial, because those things are of daily occurrence in almost every case where a killing has happened. The remarks of idle and thoughtless people do not serve as a true barometer of the public mind by any means. A man who says anything like that does not consider the effect of what he says, or that he is making a thoughtless remark; or if he really and earnestly says it he is not a good citizen, yet we know that those things are said every day. There was no actual effort made to take the defendant away from the custody of the officers. It is true quite a crowd congregated there and there was probably some excited talk among the people; and in the affidavit filed this morning it is stated that some of the crowd had guns in their possession. That is quite a general statement. There is no statement that any

particular individual carried a gun, or if he did that he had any intention of using it on anyone. The opinions of Lynch and Moore as to what they saw—that the defendant could not have a fair and impartial trial in this case—their opinions are of very little assistance or value to the court. Neither one of them are men who have been here long enough to have been well acquainted with the public mind; and while it is true that Mr. Lynch says in his travels around the county where he heard ill-considered and foolish remarks and threatening language indulged in that would indicate bias and prejudice against the defendant as far as individual persons are concerned, yet I cannot accept those statements as an invariable index of the public mind. I have decided to deny the motion at this time, or at least postpone further consideration of the motion until after we have proceeded with the work of impaneling the jury. If it then becomes apparent that owing to prejudice in the minds of the venire-men, that there is in fact such a prejudice and bias against the defendant that he cannot have a fair and impartial trial, the court would have no hesitancy, if the motion is renewed, to grant him the motion for a change of venue.''

The subsequent proceedings were destitute of anything indicating that defendant could not have a fair and impartial trial in Yuba County. One cannot read the record, in so far as it relates to the proceedings in obtaining a jury, without coming to the conclusion substantially stated by the trial judge that there had been no unusual difficulty in securing a jury, and ''that the jury obtained is an absolutely fair and impartial jury.'' We feel, after a full and careful consideration of the record, that we are not warranted in holding that there was any abuse of the discretion committed to the trial judge in this matter. Each case must be determined according to its own peculiar facts and circumstances, and these vary so in different cases that little help can be obtained from decisions in other cases.

2. Complaint is made that the trial court erred in disallowing challenges for cause interposed to jurors on the ground of bias, in three instances. It will not be necessary to determine whether such challenges, or any of them, should have been allowed. None of said jurors served as a juror in the case, each having been excused on a peremptory challenge interposed by defendant. While defendant exercised all of

the twenty peremptory challenges allowed by the law, it was not made to appear that he desired to exercise any additional challenge, or that he had the slightest objection to any juror sworn to try the cause, or any disposition to have any such juror excused. The testimony on his *voir dire* of each of those who acted as jurors showed no ground for a conclusion that he would not be an absolutely fair and impartial juror. No challenge for cause was interposed by defendant as to any such juror. Under these circumstances, the claim of defendant that the court erred in disallowing his challenge for cause to three jurors who did not serve on the trial is disposed of by *People* v. *Schafer*, 161 Cal. 573, [119 Pac. 920]. In that case it was said: "It is entirely consistent with the record that the twelve jurors who actually tried the case were absolutely satisfactory to defendant, and that he desired all of them to serve and would not have excused any one of them if he had been given the opportunity. After judgment, the contrary should not be presumed." And again, the court said substantially that the mere fact that defendant has exhausted his peremptory challenges does not preclude the application of the rule there declared, and that "the important thing is that it does not appear that an objectionable juror was forced upon the defendant." The rule so declared in *People* v. *Schafer*, 161 Cal. 573, [119 Pac. 920], is clearly in line with section 4½ of article VI of our constitution.

3. But one ruling in the matter of the admission of evidence is complained of in the briefs. Floyd Plummer, a thirteen year old boy, who witnessed the shooting, was asked on redirect examination, "Now, Floyd, from where you were standing when you testified in direct examination, and the relation of the party when he brought the gun down, did you mean that in your opinion it looked to you like he had it pointed at Officer Sperbeck," and before an objection could be interposed, answered, "Yes, sir." A motion to strike the answer out was made, on the ground that the question was leading and suggestive, and denied. The defendant's claim, as evidenced by his testimony, was that he never saw Sperbeck, that he saw only Officer Smith, and that he shot simply to frighten Smith. The witness had testified on direct examination that defendant "threw his gun around the corner at that time and leveled it like that at Mr.

Sperbeck." The effort of defendant's counsel on cross-examination was to show that all the witness knew was that the bullet hit Sperbeck, and that his conclusion that it was pointed at Sperbeck was due solely to the fact that the bullet hit him. The witness did answer, "Yes, sir," to a question of defendant's counsel asking him if that was not the fact, but he did testify further on his cross-examination substantially that he saw the gun "leveled," that he could not see that it was leveled on anyone else but Sperbeck, that he knew it was not leveled on him (the witness), because he was looking right at the defendant, that he was nearly on a line with Sperbeck and defendant, that the weapon was pointed in the direction that Sperbeck was in, and that he knew it was not pointed over Sperbeck's head because if it was "his gun would have been higher." The matter of allowing leading questions is one almost entirely within the control of the trial court, and we are not prepared to hold that there was any abuse by the trial court of the discretion committed to it in this case. It is also plain that the testimony here elicited was in substance no more than a mere repetition of matter stated by the witness both on direct and cross examination.

4. In the matter of instructions given to the jury, complaint is made that one instruction in effect defines murder of the first degree as "including all murders of a cruel and aggravated character." We are unable to see that any such definition was given or could fairly be understood by the jury as given. The contention is based on the statement of the court, in one instruction, that "in dividing murder into two degrees, the legislature intended to assign to the first, as deserving of greater punishment, *all murders of a cruel and aggravated character,* and to the second all other kinds of murders which are murder at common law." This was immediately followed by the words, "and to prescribe a test by which the degree of every case of murder may be readily ascertained." The court then proceeded to state the test, and did so clearly and accurately, making it plain to the jury that in this case the defendant could not be convicted of murder in the *first* degree, unless the killing was *willful, deliberate, and premeditated,* and stating further in terms: "The unlawful killing must be accompanied with a deliberate and clear intent to take life in order to constitute

murder of the first degree. The intention to kill must be the result of deliberate premeditation." There was nothing anywhere in the instructions in conflict with this. Complaint is made of the first sentence in the passage we have just quoted, as omitting the element of premeditation which was essential to a verdict of first degree murder under the circumstances of this case. But as we have seen, this was only a part of the definition which the court was giving; and it was immediately followed by what the court said as to the essential element of premeditation. There is no basis for a conclusion that the jury could fairly conclude from anything said by the court in any part of its charge that a first degree verdict could be rendered in the absence of deliberate premeditation on the part of the defendant.

5. Misconduct on the part of the district attorney in his argument to the jury is urged. Several statements of that officer referred to in defendant's brief were not objected to at the trial, or assigned as misconduct, or in any way called to the attention of the trial court. Of course, objections on account thereof cannot be made here.

The district attorney in the course of his argument said, "Where, I say, where can you find sympathy or one drop of mercy for such a man, such a wicked man, and possessed with such a depraved heart as the man who sits in that chair right there?" This was objected to and assigned as misconduct. It cannot be held to have been beyond the limits of proper argument. (*People* v. *Glaze,* 139 Cal. 154, 159, [72 Pac. 965].)

We are utterly unable to see any force in the claim of defendant that the district attorney was guilty of anything in the nature of prejudicial misconduct in certain statements made by him in his opening argument to the jury as to the penalty to be awarded in the event that they found the defendant guilty of murder in the first degree.

In the course of his argument the district attorney said: "Another circumstance in his story is this—a conflict in his testimony—is that they took him along through their examination as a witness, and they brought him along for some reason, from the time of his birth almost up to the time he committed this crime; but they do not go into the brush on the Feather River bottoms and let him explain his version of the affair that happened down there, whether or not he

shot at Garcia, or what he did it for. That, gentlemen of
the jury, is undenied; he did not say anything about that.''
Defendant's counsel objected to the statement, and assigned
it as misconduct, ''his commenting upon matters to which
the defendant did not testify.'' The court thereupon told
the district attorney that he should not comment on the de-
fendant's omission to testify to any particular fact, and
suggested that he be extremely careful in that respect. Testi-
mony had been given on the trial to the effect that after the
shooting of deceased, defendant ran away into the brush on
the Feather River bottoms and was there captured; that
while being pursued in that section one Garcia, who was of
those engaged in endeavoring to find him, found him, and
he (defendant) had his pistol pointed at him and told him
he had better turn around and go back; that he ''grabbed
for the gun'' and defendant started to shoot at him; that
he then shot at defendant twice and defendant then dropped
his weapon and surrendered; that defendant fired two shots
at him, but that he was not hit by either shot. While de-
fendant was a witness in his own behalf and testified as to
the circumstances of the shooting of Sperbeck, he did not
give any evidence as to what occurred after leaving the place
where the homicide was committed.

In view of section 1323 of the Penal Code, it must be con-
ceded that it is not proper for the district attorney to com-
ment on the failure of the defendant to testify upon any
subject connected with the trial, although he may have been
a witness and may have testified on other subjects. (*People*
v. *Mead,* 145 Cal. 500, 506, [78 Pac. 1047].) The section
referred to provides that the neglect or refusal of a defend-
ant ''to be a witness cannot in any manner prejudice him
nor be used against him on the trial or proceeding.'' This
court has held that it is a violation of the provisions of the
section for a trial court to permit a district attorney to
argue that the failure of a defendant to become a witness
is a circumstance tending to prove guilt. (*People* v. *Tyler,*
36 Cal. 522; *People* v. *Brown,* 53 Cal. 66.) In each of
these cases an objection to the argument was made, but the
judge declined to interfere, and in fact indicated approval
of the argument. In the case at bar the judge, as we have
seen, at once stated his disapproval of any argument of this
character, and substantially told the district attorney that

he had no right to comment on defendant's omission to testify on any particular subject, and there was no further transgression on the part of that officer. Therefore, we have here no approval or sanction by the trial court, but in fact expressed disapproval and an instruction to refrain from that line of argument. Then, too, we have nothing here but a mere statement on the part of the district attorney that Garcia's testimony was undenied, that defendant said nothing about the matters testified to by Garcia, which was a fact concerning which the jurors already had full knowledge. While it was wrong for the district attorney to comment at all on the failure of defendant to testify upon this subject, it would be most unreasonable to assume in the light of the attitude of the trial judge in the matter and the nature of the remarks, that the jury could have been influenced to the prejudice of the defendant by the statement complained of. (See *People* v. *Sansome,* 98 Cal. 235, [33 Pac. 202].) Certainly we cannot hold that this statement "has resulted in a miscarriage of justice." (Sec. 4½, art. VI, Const.)

6. On the motion for a new trial an affidavit made by one of the counsel for defendant was read and filed, reciting certain statements made to said counsel after the trial by one of the jurors. On this affidavit alone is based the claim of misconduct of the jury, and that the verdict has been decided by means other than a fair expression of opinion on the part of all the jurors. The trial court refused to consider the affidavit on two grounds, viz., that a juror cannot be allowed to impeach his own verdict, and that the affidavit here set forth matters purely of a hearsay nature, not being made by the juror but by another who simply stated what the juror told him. It is definitely settled in this state both that the affidavit of a juror cannot be received to impeach the verdict except where it is the result of a resort to the determination of chance (*People* v. *Soap,* 127 Cal. 408, [59 Pac. 771] ; *People* v. *Azoff,* 105 Cal. 632, [39 Pac. 59]), and that the same policy that prohibits a juror from impeaching his verdict by his affidavit prevents such impeachment by statements made by the juror to others. (*People* v. *Azoff,* 105 Cal. 632, [39 Pac. 59] ; *People* v. *Dobbins,* 138 Cal. 694, 699, [72 Pac. 339].) No resort to chance was shown by the affidavit here presented. The affidavit showed that from the commencement of their deliberations the jurors were unani-

mous in the conclusion that the defendant was guilty of murder of the first degree, and that the only difference of opinion was on the question of penalty, eleven jurors voting for the death penalty and one juror voting for life imprisonment. This juror finally concluded that if on the subsequent ballot all the other jurors adhered to their former vote for death, he would yield and change his vote from life imprisonment to death. The ballot showing that the other jurors did so adhere to their former expression of view, he did yield and agree to a verdict carrying the death penalty. By its ruling, the trial court practically refused to receive the affidavit in evidence, and its ruling in this regard was fully justified by the law. And it may be added that even if the facts were legally shown to be as detailed by the juror to defendant's counsel, there would be no ground therein for vacating the verdict.

No other point is made for reversal. We have fully examined the record, and find nothing therein warranting a reversal.

The judgment and order denying a new trial are affirmed.

Shaw, J., Sloss, J., Melvin, J., and Lawlor, J., concurred.