[Crim. No. 398. Fourth Appellate District.—October 21, 1940.]

THE PEOPLE, Respondent, v. EDWARD MILLS, Appellant.

Harden, Hervey & Holt for Appellant.

Earl Warren, Attorney-General, Walter L. Bowers, Deputy Attorney-General, George F. Holden, District Attorney, and Martell Thompson, Deputy District Attorney, for Respondent.

BARNARD, P. J.—The defendant was charged with the crime of grand theft under eight counts of an indictment, each of which charged that between January 14, 1938, and

November 22, 1938, he wilfully, unlawfully and feloniously took a certain sum of money belonging to Anaheim Community Growers. Two counts were dismissed during the trial, and a jury found the defendant guilty on five counts and not guilty on another. He appeals from the judgment and from an order denying a new trial.

Anaheim Community Growers is a cooperative marketing organization, organized in 1928 under section 653dd of the Civil Code. It has since that time been engaged in the business of picking, packing and shipping oranges grown by its members. It is governed by a board of seven directors who elect officers and appoint a manager. The appellant was a director, secretary and manager of the association from 1931 until he resigned on November 22, 1938. In carrying out the purpose for which it was formed the Anaheim Community Growers, through all these years, made advances from time to time to some of its grower members in order to assist them in financing their citrus operations and the production of their orange crops. Such advances were also made through these years to the president, vice-president and other directors, including the appellant, all of whom were grower members and, as such, as much entitled to advances as were other grower members. The amounts so advanced were paid out by the association's checks, which were all signed by the appellant as manager and by either the president or the vice-president.

The president and other directors testified that the board left it to the manager to make these advances as he saw fit; that the appellant, as manager, made a monthly report to the board showing the "lump sum" of such advances which were then outstanding; that the advances made by the appellant were approved in a lump sum at each directors' meeting; and that the names of individuals to whom advances had been made were not reported to the board and were not asked for by the board. The president testified that it was the practice of this and other such mutual associations to make advances in amounts which the crop might be expected to pay back, that the fixing of these amounts was usually done by the manager, and that in determining whether an advance should be made the size and condition of the "potential crop" and the market conditions at the beginning of the season were taken into consideration. He further testified that advances

were sometimes made where the crops in question were covered by crop mortgages in favor of other parties and that he himself had obtained advances when his crop was thus encumbered. The vice-president testified that this procedure in making advances was followed throughout the existence of this association, that the same procedure had been followed in its predecessor company, and that he himself had received advances in various years and "considerable advances" in 1938. Both the president and the vice-president testified that at times they signed checks in blank, leaving them with the appellant to be used in making advances and paying obligations of the association. Each testified, however, that he had never found any discrepancy in the amount of money the appellant reported as advanced and that he never knew of an instance where a check was "misused for any purpose other than the purpose they were signed for". The association's regular bookkeeper and an auditor testified that the books were correct and that all of the advances here in question were entered on the books and charged against the respective groves.

The five counts upon which the appellant was convicted relate to advances made to himself as a grower member in connection with five separate orange groves which were owned or controlled by him. While the respective counts charged him with unlawfully appropriating to himself all of the advances made during this season on these respective parcels the People elected to rely upon one advance only in connection with each orange grove and, accordingly, the appellant was convicted of taking the amount upon which the People had elected to rely as to each count. The specific advances upon which he was convicted in the various counts are as follows: In count II an advance of $500 on his home place, consisting of 5¼ acres; in count III $1,250 on a 20-acre grove; in count IV $480 on a place containing 54 acres; in count V $500 on a 15-acre grove; and in count VI $2,125 on an orange grove containing 80 acres. While he was charged with taking $20,151.73 in connection with a total of 171¼ acres, he was convicted of unlawfully taking $4,855 advanced in connection with the same acreage, or an average of about $28 per acre.

The main question presented is whether the evidence is sufficient to support the verdict and judgment. While the

offense in question is now prosecuted as grand theft the gist of the offense is embezzlement, being the fraudulent appropriation of property by a person to whom it has been intrusted, as defined in section 503 of the Penal Code. The prosecution's theory, as clearly stated during the trial, was that while the appellant had the right to make advances to himself he had made such advances in excess of amounts that were justified by his crops and that "his knowledge of the condition of his account charges him with notice that he wasn't in good faith, but was fraudulently appropriating to his own use". In other words, the contention is that while the appellant was authorized to make advances to himself he knowingly took advances to an extent not warranted by the conditions and thereby fraudulently appropriated money of the association which had been intrusted to him.

Aside from the fact that his responsibility for handling the funds of the association, in connection with these advances, was in a measure shared by the president or vice-president who necessarily signed the checks, and by all of the directors who approved them without examination, it may first be observed that there is no evidence that the appellant exceeded any specific direction or authority given to him. All of the evidence indicates that no limit as to the amount of advances was fixed or contemplated, but that such advances, while left to the discretion of the manager, were to be considered in connection with the amount and quality of a member's crop and the prospective market conditions. Apparently, the advances were supposed to be based largely on what appeared to be the likelihood of repayment from the proceeds of the crop. This fact explains the absence of any evidence to the effect that any limit had been placed upon the appellant's authority to make loans to any member, or to the effect that members were entitled to equal advances in proportion to their acreage.

■ It seems to be here contended that appellant's guilt was established since the evidence discloses that about one-third of the money advanced that season by this association was advanced to him. There were about 1200 acres of oranges owned by the members of this association, of which the appellant owned or controlled 174¼. In other words, while he owned about one-seventh of the acreage he advanced to himself about one-third of the total amount which was ad-

vanced to all grower members. On the other hand, while he owned about one-seventh of the acreage, he was convicted of appropriating for himself about one-twelfth of the total amount advanced to members. There is no evidence as to how many of the growers desired or secured such advances, or of the acreage owned by those members who shared in the advances made. If it be assumed that the members who secured advances held only one-half of the acreage in the association, it would follow that the appellant received only his proportionate share per acre.

However, as we have pointed out, there is nothing in the evidence to the effect that the members were entitled to share in the advances either equally or in proportion to their acreage. Other factors were to be taken into consideration, particularly the amount and prospective value of their crops. Considered from this angle, which is the only one that would support a conviction, there is no evidence to indicate that the appellant received advances which were not warranted by conditions as they then appeared. While it is contended that he should have known that an advance of $100 an acre on his orange holdings was excessive and unjustified, at least to the extent of the $28 per acre on which he was convicted, there is an entire absence of evidence as to the amount, quality and apparent value of his prospective crops of oranges, as compared with those of other members to whom advances were made. What he knew or what he should have done must be judged in the light of conditions at the time and not of subsequent developments. The evidence shows that $3,375 of the $4,855, for the taking of which he was convicted, was advanced during March of that year, and another $980 before the season was far advanced. It appears without conflict that, due to a bad freeze the preceding year, the outlook for favorable prices and market conditions was unusually good during the spring of 1938 and at least up to the middle of that season. These expectations were not realized due to market changes which are not even charged to the appellant.

Not only is there no evidence to show that an average advance of $28 per acre upon which he was convicted, or even of $100 per acre with which he was charged, was not justified by the amount and quality of his crops under the market conditions then appearing, but there is evidence which indicates that such advances were not unknown or unusual in

the general course of such business. During that very season, 1938, a bank in Claremont loaned the appellant $15,000 on a crop mortgage covering 45 acres of his groves with a second trust deed on 25 of those acres. One of the directors testified that during that same season, 1938, he received an advance from this association of $1,576 on 15½ acres of oranges when his land was covered by first and second mortgages and the crop was also mortgaged to an outsider. This was an advance of about $100 an acre and this director testified that he considered it proper and right at the time it was made, and that he considered that similar advances were rightfully made. This turned out to be a bad year and the proceeds of this director's crop were insufficient to pay this advance, leaving him indebted to the association in the sum of $872.14, or about $55 an acre. The undisputed evidence is that in 1935, the appellant and another gave a bank a crop mortgage on the oranges then growing on the 80-acre parcel involved in count VI here, securing a loan of $30,000, about $375 an acre, and that the crop of oranges thereon brought enough to pay off this mortgage that season.

While the respondent argues that the appellant received about one-third of the entire amount advanced to its growers by the association that year, it was not shown that such advances were not justified by his prospective crops and the apparent conditions and it is not even here suggested that the prospective value of his crops did not bear a similar relation to the value of all crops upon which advances were made. No contention is made that any part of these advances was used by the appellant for any purpose other than to maintain and retain these groves upon which oranges were to be produced. While portions were used to pay interest and principal on encumbrances on these lands, this is a part of the necessary financing involved in the production of oranges and the evidence shows that advances were customarily made to other grower members for similar purposes. In addition to all of the other matters affecting the reasonableness of the advances the appellant made to himself, under the conditions apparent at the time, a further fact is important. The appellant had a salary coming of $475 a month, which he did not draw during this period but which he left as a further credit upon his advances. This salary amounted to $5,016.16 at the time of his resignation on November 22, 1938. This credit

materially affects the apparent situation upon which he acted at the time the advances were made.

At the close of this admittedly bad season it developed that the proceeds of appellant's crops were not sufficient to pay his advances, leaving him indebted to the association. This is also true of many of the other growers, including some of the directors. The only inference justified by the evidence is that in an ordinary or average season the returns from these various crops would have paid the respective advances made. That they did not do so in this year is unfortunate, but it is far from showing that in making advances which at the time seemed justified by conditions and by past experience the appellant is to be charged "with notice that he wasn't in good faith, but was fraudulently appropriating to his own use". We are unable to find any evidence in the transcript which would support the conclusion that the advances taken by the appellant upon his crops were in excess of his authority, that they were out of proportion to the advances made to others, or that they were made with knowledge on the part of the appellant that they were excessive or not justified by the size and quality of his crop under market conditions as they appeared at that time. While many immaterial matters were ingeniously marshalled and presented to the jury as they appeared in retrospect, the real issues as to whether the advances upon which a conviction was sought were justified by the conditions existing at the time they were made were largely overlooked both in the presentation of evidence and in the respondent's arguments to the jury. There is no proof in the record that the advances in question were more liberal, in view of the conditions, than those made to some of the other members, that they were determined or fixed upon any other or different basis, or that they were not justified by the conditions as they then appeared. Whatever else it shows, the evidence fails to show a fraudulent appropriation of the advances for the taking of which he was convicted under the various counts, and the evidence is insufficient to support the judgment.

The appellant raises a number of other points which we regard largely, if not entirely, as possessing no merit. In view of what has already been said, it is unnecessary to discuss these points.

The judgment and order are reversed and the cause is remanded for a new trial.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 2, 1940, and the following opinion then rendered thereon:

THE COURT.—The respondent has petitioned for a rehearing herein on the sole ground that the attorney-general now requests, pursuant to Penal Code, section 1252, that this court consider and pass upon several rulings of the trial court, whereby certain evidence was excluded, which were adverse to the state. This request is now made for the first time. ■ As the case was originally presented the respondent did not even mention the fact that any evidence had been excluded and confined its argument to certain legal issues raised by the appellant which had no connection with the sufficiency of the evidence. Without questioning our decision on the issues submitted, the respondent seeks to have that decision set aside to the end that new and additional issues may now be considered.

Section 1252 imposes upon an appellate court the duty of considering rulings adverse to the state when requested so to do by the attorney-general, even though the appeal is taken by the defendant. That is a salutary provision, its purpose is obvious, and its benefits, in the event of a new trial, may be considerable.

However, this section undoubtedly contemplates that it is to be invoked and such a request made, when the cause is presented and before it is submitted for decision upon an appeal. It was surely never intended by this section to make it the duty of an appellate court to grant such a request unless the same was properly and timely made. It was not intended thereby to permit the issues to be divided and presented piecemeal, or to permit one of the parties to rely and submit his case upon some of the issues and, in the event of an adverse decision on those issues, to have further hearings and further decisions upon new issues which might later be raised. Such a procedure would not only impose unnecessary work on the

courts but would work an injustice on other litigants whose cases would be correspondingly delayed.

While the issues now raised happen to be very pertinent in the instant case, we are of the opinion that any benefits that might accrue from considering them at this time would be far outweighed by the evils that might well be expected to follow the setting of such a precedent.

For the reasons given, the petition for a rehearing is denied.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 19, 1940.