[Crim. No. 3099. First Dist., Div. One. Aug. 25, 1955.]

THE PEOPLE, Respondent, v. MELVIN A. ZELVER, Appellant.

Brian M. Rowson and Dennis L. Woodman for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

PETERS, P. J.—The defendant was tried and convicted on an indictment charging him with three counts of felony. The first count alleged a violation of Penal Code, section 448a, arson, for the wilful and unlawful burning of a warehouse at 1225 Spring Street, Redwood City. The second count charged a violation of Penal Code, section 548, the burning of goods at 1225 Spring Street in Redwood City with intent to defraud and prejudice the insurer. The third count charged a violation of Insurance Code, section 556, subdivision (b), the preparing of a writing to be presented and used in the presentation of a false and fraudulent claim for payment of loss under an insurance contract. The jury found defendant guilty on all three counts. On motion for a new trial, the court held that the offenses in Count I and Count II were not severable, granted a motion for a new trial as to Count II, and then dismissed Count II of its own motion. The defendant was then sentenced to the term prescribed by law on Counts I and III, the sentences to run concurrently. The defendant appeals from the judgment of conviction on Counts I and III. The respondent seeks a review of the propriety of the order granting the new trial as to Count II.

The defendant was president of Danzer Sales Company which, in 1951, was leasing, at 1225 Spring Street, Redwood City, a warehouse from which the defendant conducted a wholesale furniture business, handling some of the goods on a consignment basis. On the night of May 26, 1951, a fire completely destroyed the building and its contents. The fire was concentrated in the center of the building, and, according to the Redwood City fire chief, was of a suspicious nature. Moreover, the fire department had found one of the doors of the building open upon their arrival.

At the time of the fire, Danzer Sales Company had a policy of insurance with the United States Fire Insurance Company.

This policy was of the ''stock provisional'' type, that is, it covered fluctuations in inventory evaluation and required the insured to file monthly reports of value from which the premium was computed. It provided for a penalty on failure to file such reports by limiting the amount recoverable on loss to 75 per cent of the face value of the policy. The face value of the policy at the time of the fire was $50,000. For a period of eight months prior to the fire no inventory reports were received by the insurance company, but, on May 28th, two days after the fire, an inventory report dated May 26th, the day of the fire, on the letterhead of the Danzer Sales Company and signed by the defendant, was received by the insurer covering the past eight months. The inventory valuation reported as of May 26, 1951, was $48,863.45.

On June 5, 1951, the defendant, at the insurer's office in San Francisco, executed a proof of loss on behalf of Danzer Sales Company. The insurer then issued its draft in the amount of $37,500 (computed on the basis of 75 per cent of the face value of the policy for failure to file inventory reports) in payment of the claim.

The defendant, in April of 1951, had purchased ''use and occupancy'' insurance effective May 21, 1951, five days before the fire. This policy was taken out on the solicitation and advice of the defendant's insurance agent.

The defendant's conviction is based primarily upon the incriminating testimony of Donald Stoner. Stoner testified that he was employed part time by the Danzer Sales Company. About two months before the fire, the defendant approached him, told him of his financial difficulties, and told him that he had sold some furniture on consignment and did not have the money to pay for it. Defendant then suggested that Stoner help him burn the warehouse and collect the insurance. This same suggestion was made by defendant to the witness on several later occasions, and finally, on the day of the fire, Stoner agreed to burn the building and its contents. Stoner testified that on that day the defendant told him that it was ''now or never,'' and that ''some men were coming up from Los Angeles to take their stock, and he didn't have it.'' Stoner then agreed to burn the warehouse, motivated, he said, by both a previous promise by the defendant to help him purchase a house, and his friendship for the defendant. Stoner testified that that afternoon he had helped stack in the center of the warehouse three or four hundred wooden chairs, wrapped in excelsior, in a stack

8 feet wide, 15 feet long, and 10 feet high, and that he and the defendant had discussed the best way to ignite it, and decided that it would be best to move a waste box over against the pile and start the fire in it. Stoner stated that at around 8:30 or 9 p. m., he and his brother-in-law, John Higgs, also an employee of Danzer Sales Company, went down to the warehouse. They entered with a key the defendant had given Stoner that afternoon, and Stoner then lit the fire by setting fire to the waste in the waste box. He testified that Higgs did not know his purpose in going to the warehouse, nor did he participate in the setting of the fire. After setting the fire, Stoner told Higgs of his conversations with the defendant. The next day, Stoner, his wife, and Higgs went over to the defendant's home and returned the key.

Stoner's testimony was corroborated by that of Higgs who testified about going with Stoner to the warehouse on the night of the fire, going in with Stoner, and seeing Stoner light the fire. Higgs testified that he was unaware of Stoner's purpose in going to the warehouse and did not participate in setting the fire. Higgs also testified that after the fire he was present at a conversation between Stoner and the defendant at which time he heard the defendant tell Stoner that he "would take care of" him.

Richard Walker testified that on May 11, 1951, some two weeks before the fire, at the defendant's request, he had loaned Stoner $2,500 so that Stoner could buy a home, and that he had received a deed of trust on the home as security.

Danzer Sales Company at the time of the fire was in precarious financial straits. An attorney had been retained by several creditors to collect some $15,000 in debts, and had pressed defendant for payment previous to the fire. The defendant admitted that Danzer Sales Company was $40,000 to $50,000 in debt, and that just prior to the fire he was embarrassed for cash, and that on September 4, 1951, Danzer Sales Company had gone into involuntary bankruptcy.

The trial court instructed the jury that as to Count III, the preparation of a writing with intent to present the same in support of a false and fraudulent claim of loss under an insurance contract, Higgs and Stoner were not accomplices as a matter of law, but that as to Counts I and II, Stoner was an accomplice as a matter of law. The court properly defined the term "accomplice," and further instructed the jury that a conviction could not be had upon the testimony

of an accomplice unless it was corroborated by such other evidence tending to connect the defendant with the commission of the offense.

It was clearly error to instruct that as to Count III, Stoner was *not* an accomplice as a matter of law. Under Penal Code, section 1111, an accomplice is defined "as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Under Penal Code, sections 31 and 971, any person who aids or abets the commission of a crime, even though not present, is a principal, and is subject to prosecution for the crime. Although Stoner did not prepare or present the fraudulent insurance claim, he admittedly burned the property at the solicitation and request of the defendant, knowing that such destruction of the property was to be used as the basis for the false claim. He thus was an aider and abettor to the filing of that false claim, his very act making that filing possible. He therefore was an accomplice as a matter of law, whose testimony under Penal Code, section 1111, required corroboration. (*People* v. *Lima,* 25 Cal.2d 573, 578 [154 P.2d 698].)

But this error does not require a reversal. Certainly such error could not have resulted in a miscarriage of justice within the meaning of article VI, section 4½ of the Constitution.

On Counts I and II, the jury, on proper instructions that Stoner as a matter of law was an accomplice, that the jury should determine as a fact whether Higgs was an accomplice, and that to return a verdict of guilty they must find corroborative evidence of the accomplice tending to connect the defendant with the commission of the offense, returned a verdict of guilty. Thus, under proper instructions, the jury found corroboration of Stoner's testimony, and either found that Higgs was not an accomplice or that his testimony was also corroborated. Thus, the misdirection as to Count III could in no way have prejudiced the defendant.

The basic problem is whether Stoner's evidence was sufficiently corroborated. The type of corroboration necessary has frequently been discussed by the courts. In *People* v. *Henderson,* 34 Cal.2d 340, 342 [209 P.2d 785], one of the latest cases on the subject, it is stated: "Although the corroborating evidence must raise more than a conjecture or suspicion of guilt, it is sufficient if it connect the defendant with the commission of the crime in such a way as reasonably

to satisfy the fact finding body that the accomplice is telling the truth. [Citation.] ■ The evidence of inculpatory participation need not be direct nor extend to every fact and detail. It may be circumstantial and is sufficient, even though slight, if it tend to connect the defendant with the commission of the crime.''

■ In *People* v. *Suter,* 43 Cal.App.2d 444, 451 [111 P.2d 23], quoting from *People* v. *Morton,* 139 Cal. 719, 724 [73 P. 609], which, in turn, was quoting from a Texas case, it is stated: '' '. . . eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be any inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, although the accomplice may be corroborated in regard to any number of facts sworn to by him.' '' Then, quoting from another Texas case, also quoted in the Morton case, the following rule was approved: '' 'The evidence must tend directly and immediately to connect the defendant with the commission of the offense.' '' (See also *People* v. *Kempley,* 205 Cal. 441 [271 P. 478]; *People* v. *Davis,* 210 Cal. 540 [293 P. 32].)

■ It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test. (*People* v. *Trujillo,* 32 Cal.2d 105, 111 [194 P.2d 681].) ■ Corroboration is not sufficient if it requires interpretation and direction to be furnished by the accomplice's testimony to give it value. (*People* v. *Reingold,* 87 Cal.App.2d 382, 393 [197 P.2d 175].)

■ The testimony in the present case, measured by these standards, is sufficient. In the first place, if it may be properly inferred from the verdict of the jury that it found Higgs, as a fact, was not an accomplice, then, of course, the evidence here exceeds the bounds of the measure. Higgs' testimony clearly shows that the setting of the fire was not an accident, and it directly connects defendant with the crime by his testimony of hearing a conversation between Stoner and the defendant to the effect that the defendant would take care of Stoner, and also through his own observation of seeing Stoner return the defendant's key to him after the fire.

In the second place, even without Higgs' testimony, the measure required by the law is fully met. There is the testimony of the fire chief as to the suspicious nature

of the fire; the open door of the building; the submission by the defendant of inventory reports, required monthly, filed eight months late, and dated on the very day of the fire; the taking out of a "use and occupancy" insurance policy effective five days before the fire; the loan by Walker to Stoner of $2,500 at defendant's request two weeks before the fire, and the admitted financial difficulty of the defendant and his company. In *People* v. *Hanks,* 35 Cal.App.2d 290 [95 P.2d 478], evidence of a similar character was held sufficiently corroborative.

On this appeal the defendant contends that the county of San Mateo was not the proper county for the trial of Count III, since the proof of loss was prepared, executed, and delivered in the city and county of San Francisco. Count III of the indictment alleged that "on and between the 26th day of May, 1951, and the 5th day of June, 1951, at and in the County of San Mateo, State of California, [the defendant] did wilfully, unlawfully, knowingly, fraudulently and feloniously prepare, make and subscribe to a writing with intent to present and use said writing . . . in support of a false and fraudulent claim for the payment of $37,500.00 loss under a contract of insurance."

Penal Code, section 777, provides that ". . . the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed." Section 781 provides: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

While there can be no doubt that the evidence shows that the proof of loss was prepared, executed, and delivered in San Francisco, the fact is that the prosecution relied not on the proof of loss to establish jurisdiction of the offense defined in section 556, subdivision (b), of the Insurance Code, but upon the inventory report of May 26, 1951, which was prepared in and mailed from Redwood City in the county of San Mateo, on the day of the fire. ■ Insurance Code, section 556, provides:

"It is unlawful to:

"(a) Present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance.

"(b) Prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented or used in support of any such claim." Under this section, the writing required need not be false or fraudulent as long as it is intended to be presented or used in support of any false or fraudulent claim. There is ample evidence to support an inference that the inventory report dated on the very day of the fire was intended to be used in support of the fraudulent claim, and in fact was considered by the insurance company in adjusting the loss, although they relied, primarily on other means to determine the value of the property destroyed. The inventory report having been prepared and mailed in San Mateo County, this count was triable in that county, venue being in either the county where the document was mailed, or the county where it was received. (*People* v. *Thorn,* 138 Cal.App. 714 [33 P.2d 5].) It should also be mentioned that the subject matter of the claim, that is, the destruction of the property, occurred in San Mateo County. That act alone justifies the trying of the charge in that county, because it was an act "requisite to the consummation of the offense" under Penal Code, section 781. It has been held under this section, in a prosecution for receiving money under false pretenses, that venue is in either the county where the pretenses were made or where the money was received. (*People* v. *Bocchio,* 80 Cal.App. 138 [251 P. 672].) It has also been held that in a prosecution for robbery of a taxicab, the county in which the taxi was procured or the county in which the robbery took place were proper counties for trial, since the procuring was a part of the scheme employed for the consummation of the robbery. (*People* v. *Anderson,* 3 Cal.App.2d 521 [40 P.2d 270].) Also, it has been held that where arrangements were made in one county and an abortion took place in another, either was a proper place of venue. (*People* v. *Anderson,* 90 Cal.App.2d 326 [202 P.2d 1044].) In a prosecution for statutory rape, it has been held that either the county in which the defendant invited the prosecutrix into his car or where the actual commission of the offense took place had venue. (*People* v. *Ortez,* 120 Cal. App.2d 469 [261 P.2d 325].) These cases are decisive on the present issue.

 On motion for a new trial, the defendant presented the affidavit of the juror, Myrtle Strong, to the effect that she had been "coerced" and "intimidated" into voting for a verdict by insulting and abusive language used to her by other

members of the jury. The trial court rejected the affidavit, and properly so. The rule that a juror cannot impeach his own verdict except in the single case of a verdict arrived at by chance or lot is too well intrenched to be now challenged. (*People* v. *Gidney,* 10 Cal.2d 138 [73 P.2d 1186]; *People* v. *Sherman,* 97 Cal.App.2d 245 [217 P.2d 715]; *People* v. *Kromphold,* 172 Cal. 512 [157 P. 599]; *People* v. *Wong Loung,* 159 Cal. 520 [114 P. 829]; *People* v. *Long,* 15 Cal.2d 590 [103 P.2d 969]; *People* v. *Evans,* 39 Cal.2d 242 [246 P.2d 636].)

The respondent requests that we review the orders granting a new trial as to Count II, and dismissing that count. The trial court made these orders because it believed that Counts I and II were inseparable offenses. The People claim the right to such a review under the provisions of Penal Code, section 1252. It provides: ''. . . On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General.'' (See *People* v. *Mills,* 41 Cal.App.2d 260 [106 P.2d 216, 628]; *People* v. *Acree,* 132 Cal.App. 193 [22 P.2d 518]; *People* v. *Roland,* 134 Cal.App. 675 [26 P.2d 517]; *People* v. *Singh,* 1 Cal.App.2d 729 [37 P.2d 481].)

 Count I charged in substance, the arson of the warehouse in violation of section 448a of the Penal Code; Count II, the burning of insured merchandise therein to defraud the insurer in violation of Penal Code, section 548. The trial court was in error in finding them to be inseparable crimes. *People* v. *Hurst,* 57 Cal.App. 473, 475 [207 P. 499], holds that such offenses are separable: ''The offenses are different and connected together in their commission; one being for arson, and the other for burning insured property, its contents, with intent to defraud. By the one act . . . two crimes were committed.'' The orders granting the new trial and dismissing Count II were erroneous.

Now what is the effect of this error? It certainly cannot result in a reversal of the judgment in favor of the People. Penal Code, section 1238, provides for the circumstances under which an appeal may be taken by the People. The People could have appealed from the order granting a new trial but did not do so. The statute here involved was intended to give the People the right, on an appeal by the defendant, when a judgment of conviction is reversed, to raise points that might be involved on a retrial. The statute was not designed

to give the People a right in the nature of an appeal. The right of appeal is governed by other sections of the code. Thus, although the ruling of the trial court was adverse to the People and erroneous, we have no power on the appeal by the defendant where an affirmance results, to rectify it by reversing or modifying the judgment in favor of the People.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied September 8, 1955.