[Crim. No. 7693.   Second Dist., Div. One.   Aug. 29, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD E. LOOMIS, Defendant and Appellant.

Matthews & Stanley, Al Matthews and Robert W. Stanley for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and N. Gregory Taylor, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—In Count 1 of an indictment the defendant was accused of violating section 548 of the Penal Code in that

he unlawfully, and with intent to defraud the insurer, burned and destroyed an insured airplane. In Count 2 he was accused of violating section 556, subdivision (a), of the Insurance Code in that he unlawfully presented a fraudulent claim for loss of an insured airplane. In Count 3 he was accused of conspiracy to violate the two code sections referred to in Counts 1 and 2. In Count 4 he was accused of murder (the alleged victim was the pilot who was in the airplane when it fell and burned).

In a jury trial he was convicted on the first three counts and was acquitted on Count 4. (The judge had stated to the jury that he thought that the charge in Count 4 [murder] had not been proved.) Defendant was sentenced to state prison on each of the three counts—the sentences to run concurrently. He appeals from the ''judgment of conviction and sentence,'' and from the denial of his motion for a new trial.

Appellant contends that the evidence was insufficient to support the convictions.

Prior to 1955 the defendant, who was a former airplane pilot, had been engaged in the business of buying and selling surplus airplane engines, under the name of International Procurement Enterprises. In January 1955 he (as president), Earl Heaton (as vice-president), and Anthony Doria (as secretary) formed a corporation, known as Trans-World Engineering Company, for the purpose of engaging in a similar business. Other than the money received from the sale of 500 shares of stock at $1.00 a share, the corporation had no assets. During the time the corporation was being formed, Heaton and Doria made a personal loan of $30,000 to defendant.

Within a few weeks thereafter the officers of Trans-World Engineering decided that the company should also engage in the business of aerial mapping and survey photography. Lewis Leach, an airplane pilot who had several years' experience in aerial mapping, was employed by the company to do that kind of work. Leach said that he believed that the De Havilland Mosquito bomber (airplane) was the only type of plane that would meet the requirements as to altitude and speed in connection with that work. He also told the officers of the corporation that four or six such bombers were available in New Zealand and could be purchased. Defendant, acting on behalf of Trans-World, negotiated with a New Zealand firm and entered into a contract with it for the purchase of four ''Mark 6'' Mosquito planes for a total amount of $15,000. In February 1955, pursuant to defendant's directions, Leach

went to New Zealand and paid $5,000 to the New Zealand firm—$3,750 of that amount was payment in full for one plane, and the remainder was a deposit on the purchase price of the three other planes. The planes had been preserved or "pickled" after the war—they were covered with a preserving grease or oil. About the first of March, Leach piloted one of the planes to the Pacific Airmotive Corporation in Burbank. This one will be referred to as the "Mark 6." The other three planes were not paid for or brought to the United States.

Meanwhile, defendant was informed that a later or better model of Mosquito plane, known as "Mark 35," was available in England. In April or May 1955, pursuant to directions of defendant, Leach went to England and purchased a "Mark 35" plane for $8,000 (reassembled and ready to be flown), which amount of money had been delivered to Leach by defendant for that purpose. It was purchased in the name of Trans-World Aerial Surveys, which was a name that defendant used in his personal business transactions. The plane had been "pickled"—it had been dismantled, was covered with a preserving grease, and was in a hangar. The plane had been flown about 60 hours. Approximately 40 other planes were stored there. Leach and six other men worked approximately three weeks in reassembling the plane which he had purchased, and then he piloted it to Los Angeles.

The De Havilland Mosquito was an English built two-motor airplane. Its wings and body were made of plywood. The model known as Mark 6 was designed for "aerial combat." The Mark 35, which was designed for high altitude bombing, may be flown at a maximum rate of 500 miles an hour, but it must be flown at a minimum rate of approximately 150 miles an hour or it is likely that it will overheat and "burn up." The Mosquito planes are difficult to pilot when the landing gear and flaps are down.

In the meantime Trans-World Engineering was awarded a government contract for aerial survey work in the Sacramento area. Expense was incurred in equipping the Mark 35 with cameras for doing that work. Defendant was required to obtain a surety bond in the amount of $5,508.22 to guarantee the proper performance of work, and he was required also to make a financial statement concerning Trans-World Engineering. Defendant, Doria and Heaton executed an agreement indemnifying the bonding company against loss. The financial statement made by defendant contained misinformation, as follows: that Trans-World Engineering owned five De Havil-

land Mosquito bombers, two cameras, and options to purchase eleven more aircraft from the New Zealand firm, that the purchase price of such an aircraft was $35,000, with a market value in the United States of $75,000; and that two other pilots and another photographer were available on a call basis.

In the early summer of 1955 when Leach and a photographer were beginning the survey work (using the Mark 35), the credit of Trans-World Engineering went "sour." During a short period of time, Pacific Airmotive Corporation, on whose premises the Mark 35 was based, would not allow the plane to leave the premises because charges for parking, gasoline, oil, and tie-down insurance had not been paid. Trans-World Engineering defaulted on the government contract and the bonding company was required to pay the government under the terms of the surety bond. Thereafter, Leach piloted the airplane to Denver on another survey project for the government, but by reason of snow in that area the work could not be done, and Trans-World defaulted again, and the bonding company was required to pay a second bond. The two defaults cost $2,027.73, and Doria paid $800 of this amount.

Leach brought the Mark 35 back to Pacific Airmotive base and this was his last flight for Trans-World Engineering, because he had not been paid regularly and he had to obtain work elsewhere.

In November 1955 Pacific Airmotive attached the Mark 35 and chained it to a fence for the reason defendant had not paid amounts he owed for parking space, gasoline, etc.

Leach testified that in February 1956, when he asked defendant to pay his salary (about $3,300), defendant said that Trans-World Engineering could not pay him because it was broke and had no work; that in April 1956 defendant said again that the company was in bad financial condition, that he had lost money on the contracts, he had more money invested in the planes than he had received on the contracts, and he could not pay; Leach said that he had to have the money even if he had to sue for it; defendant said he could get the money by selling the plane or collecting the insurance on it, and that the plane was insured for $40,000 and if anything happened to it they could collect the insurance and their problems would be over.

Later in the spring of 1956, defendant told Airmotive that he wanted to get the Mark 35 released from the attachment

so that he might complete a survey contract. Pursuant to that request, an arrangement was made whereby the money to be paid for the survey would be paid into escrow, and a part of the money would be used to pay Airmotive's charges. The plane was released, and as a result he paid approximately 90 per cent of the charges. About a month later the plane was returned to the Airmotive base where it remained and was not flown for approximately one and one-half years—until July 1, 1957 (the date the airplane fell and burned, as hereinafter related).

About August 1956 defendant transferred the title of the Mark 6 to Insurance Finance Corporation as security for a loan of $5,000. Defendant defaulted in making the payments thereon, and the finance company repossessed the plane and sold it in the latter part of 1956.

In December 1956 defendant borrowed $5,000 from Continental Thrift (loan company) at 10 per cent interest for a period of six months, and gave a mortgage on the Mark 35 as security for the loan. He also obtained a vendor's single interest insurance policy in favor of the finance company for $2,687.50, covering the hull of the plane. He did not pay the insurance premium of $53 until June 27, 1957 (three days before the plane fell).

Carl Sturm, who had been manager for Insurance Finance Corporation, testified that in January or February 1957, defendant asked him to get ''$50,000 worth of hull insurance on the Mark 35 Mosquito''; he (witness) asked why he wanted the insurance; defendant replied that the airplane was going to have an accident and that the witness (Sturm) would profit financially by it; in April or May 1957, when Sturm was at Pacific Airmotive, he saw the defendant and another person engaged in some activity around the plane; defendant said that the plane was being prepared for a test flight, and if Sturm would get $100,000 insurance on the plane and if Sturm's brother would fly the plane and an accident happened, Sturm and his brother would get $50,000; defendant said that one method of crashing a plane is ''leaning out an engine,'' which means ''leaning the gas down,'' causing the engine to overheat and catch on fire; when Sturm asked how this would be covered up, defendant replied that there would not be anything left of the plane to investigate; about the first of June 1957, defendant asked Sturm to get $50,000 of insurance on the plane; then Sturm told him to call Bill Koosman.

Jack Sturm (brother of Carl), an airplane pilot, testified that in the early part of 1957 he had discussions with defendant regarding aerial photography in Yucatan, Mexico; during those discussions defendant said that he had heard that it was difficult to bail out of this kind of plane; Sturm said it was difficult, but if he were in serious trouble in a plane he would "belly it in"; defendant asked how much damage would be done by "bellying" a plane; Sturm replied that occasionally thereafter a plane could be flown again; he also said that the only way to completely destroy a Mark 35 in a jungle like Yucatan would be to belly it in on a beach at low tide, and when the tide came in the water would make the plane incapable of flight; during that conversation Sturm checked the plane, and found that the hydraulic system was functioning and there were no leaks.

Mr. Lencer, a motion picture producer, testified that in several conversations with defendant they discussed disposing of the Mark 35; defendant said he was going to raffle it for the benefit of the State of Israel, or he was going to advertise to sell it; on June 15, 1957, defendant told Lencer that he was going to discontinue advertising the Mark 35 for sale, because he had not been successful in getting a buyer; he offered to sell the plane for use in a movie crash scene, but Lencer told him there was no demand for war scenes and that the cost of wrecking a plane was unrealistic when clips of airplane accidents could be obtained; defendant replied that he would have to have the airplane wrecked or burned so that he could collect on the insurance.

Mr. Brown, an airplane pilot, testified that in May 1958, when he was applying for employment by defendant as a pilot, they discussed the matter of obtaining aerial survey contracts; at that time defendant said he was in debt and saw no way of earning money on such contracts, or on subcontracts with other companies; he asked Brown if he would be interested in wrecking the plane and sharing the insurance money; he mentioned $50,000, of which amount he would pay Brown $10,000; defendant said that probably the best way to wreck the plane would be to simulate landing gear failure; the way to simulate landing gear failure would be for the pilot to tell the control tower, by means of radio, that he was having difficulty in getting the landing gear down; and then the pilot should go to a higher altitude and jump out of the plane; the defendant also said he "would contact someone" to paint the

plane so that the impression would be made that he planned to spend money on it, and the "accident" would look like an accident; defendant suggested that they exchange letters discussing the terms of Brown's employment by defendant, wherein Brown would be offered 20 or 25 per cent of the proposed aerial survey work; Brown said he was concerned about what an accident investigation would reveal, and defendant said there would not be enough of the plane left to have an investigation or find out whether anything was wrong; later, the defendant told Brown that he had two prices on the cost of painting the Mark 35 and would order the work to be done after a flight test; the plane was to be relicensed on an annual license and then, according to defendant, Brown was to take it up on a test flight and jump out of it; Brown went to Australia immediately after these discussions, and when he returned three weeks later he found a letter from defendant which he read several times and which he destroyed when he heard that the Mark 35 had crashed.

Defendant learned indirectly through Jack and Mary Ford, owners of Fleetways Airlines, that a pilot, by the name of James Gibbs, 31 years of age, was available for employment. Gibbs had done maintenance work and some flying for Fleetways, but he had not flown aircraft similar to the De Havilland Mosquito. Gibbs was in the Air Force during the Second World War, but he received no pilot training; after the war he attended flying schools and worked at Ryan Aircraft in San Diego; he obtained some commercial flying experience and received minor injuries in a crash in 1956. In June 1957 he did some flying for Universal Studios. A witness testified that Gibbs' financial condition was bad during the 30 days prior to July 1, 1957 (the date the plane fell). Defendant had several meetings with Gibbs, wherein a business arrangement between them was discussed.

On June 20, 1957, defendant wrote Gibbs a letter listing the requirements required of a pilot who would be qualified to fly for him—a high moral character, a minimum of 4,000 flying hours in heavy multiengine aircraft with 2,500 of those hours as a first pilot. The letter stated further that Gibbs should have no trouble with these requirements since he had been an officer and pilot with the Air Force, with previous experience in flying heavy multiengine aircraft. In that letter he asked that Gibbs send him a list of aircraft which he was qualified to fly as pilot, and he said that he would make arrangements with Pacific Airmotive to let Gibbs check over the Mark 35.

About June 24, 1957, Gibbs showed a handwritten document to Jack and Mary Ford, who read it and discussed it with Gibbs. Mary Ford testified that the matters stated in the document were false. It was stated therein that he had 4,700 hours of flying time in all types of aircraft with no incidents or violations filed against him. Gibbs had the document copied in typewriting, and thereafter he delivered the typewritten paper to defendant.

Gibbs telephoned his father, who is an attorney in San Diego, and asked him to prepare a contract of employment for him. A two-page contract formalizing the son's instructions was prepared.

About June 25, 1957, Gibbs and defendant signed a joint venture agreement whereby Gibbs was to fly defendant's Mark 35 and attempt to procure business. His compensation was to be 20 per cent of the revenue from any venture. The last paragraph stated the aircraft was to be insured for $50,000, and if it should be damaged beyond repair, then Gibbs should have a lien on the insurance and salvage proceeds to the extent of 20 per cent. In the event of Gibbs' death, all benefits should be paid to his estate.

At 10 p. m. on that same day, June 25, Gibbs wrote a codicil to his will which stated that all his money or property should go to his son, with the exception of $1,000 which should go to his future wife if he had $10,000 due to him at his death.

On June 26, 1957, defendant met with officials of Pacific Airmotive to secure the release of the Mark 35 which had been chained to the fence since January or February for nonpayment of charges. Pacific Airmotive agreed to release the Mark 35 after defendant had given a promissory note for $1,000 and a bill of sale covering 3 Packard Merlin engines as security. Later, when Pacific Airmotive attempted to obtain the engines, defendant said he had sold them for $85.

On June 27, 1957, defendant obtained insurance for the Mark 35 from Bill Koosman, who had gotten it from Chet Laws of the firm of Sayre and Tosa, underwriters for Lloyds of London. This policy provided limits up to $50,000 for hull, ground, or flight damage and $1,000,000 for public liability and property damage resulting from the operation of the Mark 35, with a provision that the insured would pay the first $2,500 for damage occurring while the plane was in flight or taxiing. The policy also provided that the Mark 35 would

be flown to San Antonio, Texas, and return for an altitude test. The insurance was to cover the time from June 27 to July 28, 1957, and the premium was $526.

At approximately this time, defendant borrowed an additional $4,000 from Doria, saying that it was to insure the plane and allow him to bid on another government mapping contract. Defendant still owed Doria a balance of $17,500 on the $30,000 loan made in 1955. He also owed to Continental Thrift the $2,500 which was due on June 12, 1957, but he was granted a verbal extension on the date for repaying this loan.

Also on June 27, 1957, defendant gave Koosman two checks, one for $521 and one for $53,—the first one was for the premium on the $50,000 policy, and the other one was for the premium on the policy in favor of Continental Thrift.

On June 28, 1957, Gibbs told Richard Cauble, an employee of the Pacific Airmotive, that he was going to test fly the Mark 35 and make a lot of money on the flight. Cauble asked whether a lot of money could be made on a test flight, and Gibbs replied, "Yes." Cauble suggested that Gibbs let Jack Ford test the airplane since he had a lot of experience flying Mosquitoes. Gibbs replied that he was going to make a lot of money on the flight.

On June 30, Mary Ford, who had flown Mosquitoes during the war in England, went to Pacific Airmotive to assist Gibbs in checking the Mark 35 for leaks in gasoline, oil, and hydraulic fluids. She showed him how to operate the controls in the cockpit, and gave him a list of different throttle settings for fuel, air speed, take off, climbing, cruising, and landing.

Other items of indebtedness of defendant on July 1, 1957, were: grocery bills—about $500; milk bills—about $200; gasoline—several hundred dollars; merchandise from department stores—about $1,500; parking, etc., at Airmotive—$1,100.

On July 1, 1957, while defendant, Gibbs, and Cauble (employee of Airmotive) were present at the place where the Mark 35 was stationed at Airmotive, Gibbs inspected the plane. His inspection included checking the water in the tanks, removing the locking caps, and going into both wheel wells. While he was in the wells the only portion of his body that could be seen (by Cauble) was his legs below the knees. Defendant also inspected the plane at that time, and he had with him a screw driver and a pair of electrical lineman's pliers. Then Gibbs put the parachute into the plane, picked up a portable radio, and entered the plane. He

signaled for help in starting the two engines. Then defendant, from his position on the ground, primed the two engines and they started to operate. While Gibbs was warming up the engines during the next three or four minutes, defendant made a check of the wheel wells. He stayed a short time in the left well, but he stayed a considerably longer time in the right well. While he was in the wells the only portion of his body that could be seen (by Cauble) was his legs below the knees. After defendant came from the right well he gave an "O.K" signal to Gibbs and the plane then taxied to the runway.

According to Blevans, Taylor, and Cauble, who observed the plane take off, the plane stayed on the ground a considerable length of time after starting the take off. Blevans and Taylor were of the opinion that the reason for the delay in getting airborne was that the plane was underpowered. Viewing the evidence in the light favorable to the prosecution, there was evidence that as the plane became airborne the left landing gear retracted but the right landing gear stayed down; a few seconds later a white vapor began to trail behind the right engine; the plane proceeded in a circle until it passed over the place where it had taken off and as it passed that place it was at an altitude of approximately 1,000 feet, and the right landing gear was still down and a white vapor was still trailing; the plane was flying too slow for that type of plane and it sounded as if it were underpowered; when the plane (traveling west) disappeared from view, Cauble went into the guard shack and listened to a radio which was tuned to the airport tower; defendant was in the shack when Cauble arrived there; the tower was calling to Gibbs but an answer from Gibbs, if any, could not be heard; Blevans, who was in an automobile near the south boundary of the airport, noticed that when the plane passed that place the right landing gear was down and a white vapor was trailing the right engine; at that time the plane was at an altitude of 700 or 800 feet and was traveling toward Van Nuys at a rate of approximately 170 miles an hour; a few minutes later a man (Mr. Hoak) who was in Van Nuys at a place about 15 miles from the take off place, observed that the plane was at an altitude of approximately 500 feet, was emitting blue smoke from the right engine, and that the right landing gear was down and one of the engines was sputtering and missing; the plane started to lose more altitude and turned toward the Van Nuys airport; then the plane turned away from the airport, headed

west, and attempted to gain altitude; at that time a large black cloud of smoke was emitted from an engine; a man (Mr. Morrison) who was on his ranch near Agoura about 25 miles from the take off place, heard an unusual noise of an airplane, and then saw it traveling at an altitude of approximately 300 feet in a very irregular and erratic manner; as the plane disappeared over a mountain ridge it veered to the right; thereafter a cloud of black smoke arose from behind the ridge; the plane fell and burned, and all that was left of it was metal; Gibbs was killed.

Soon after the plane had crashed, Cauble answered the telephone in the shack where he and defendant had been listening to the radio, and he was informed that the plane had crashed. After defendant had also participated in that telephone conversation, he said that the plane was down west of the valley and that he was going to the plane. At that time defendant appeared calm and not excited.

When defendant and Taylor were returning from the scene of the crash, defendant said that Gibbs (the deceased pilot) owed him $1,500 and he was going to get the money back or he would take Gibbs' automobile.

The next day after the crash, Gibbs' sister took his automobile (a 1954 Lincoln) from the airport to her home. On that same day (July 2) defendant went to the sister's home and told her and Mr. Kerber Gibbs (the father of James Gibbs) that he had advanced $1,500 to James prior to the flight, and that he (defendant) would accept James' automobile in payment of that amount. At a later date, when the father was talking to defendant concerning the $1,500, the defendant said that he had paid that amount to James by check. Later (on August 9), defendant told the father that he had paid the $1,500 to James in cash at various times.

Soon after the crash, when Mr. La Boyteaux, an insurance adjuster, was conversing with defendant regarding the airplane, defendant said that the plane was on a test flight preparatory to its use in aerial photography, that the pilot was an experienced commercial pilot with 1,600 to 2,200 hours of flying, that the plane had very few flying hours in it, and that the settlement would have to be on a cash basis since no other Mark 35 plane was available.

Defendant did not tell the adjuster that in February 1957 one McIntire had given defendant a written option to sell (for McIntire) a Mark 35 plane which was equipped for aerial survey, nor tell him that during June 1957 the de-

fendant had tried unsuccessfully to sell the plane. The Mc-Intire plane was not sold until March 1958. (The insurance claim was paid in August 1957.)

Prior to the settlement of the claim, the insurance agent Laws who obtained the insurance from Lloyd's, and the broker who referred the matter to Laws, agreed that Laws should receive $250.

The insurance adjuster could not find a plane similar to the Mark 35. Meanwhile, the defendant, the agent, and the broker had telephoned the adjuster many times urging that the claim be paid. The adjuster offered to settle for $37,500, but defendant rejected the offer. At a meeting in the adjuster's office, the defendant, the agent, and the broker said that the plane had a value of $50,000 and that they wanted the money at that time because defendant had some indebtedness that had to be paid. The adjuster submitted the matter to the London office, and it was decided to pay the policy in full. The policy was for $50,000 with a provision that $2,500 was deductible and chargeable to the owner. Defendant signed a claim or proof of loss for $47,500, and that amount was paid to him by the insurance company.

On August 9, 1957, defendant told Mr. Kerber Gibbs that the insurance settlement of $37,500 would be paid soon. Then Mr. Gibbs asked defendant to give him an assignment of 20 per cent thereof so that he could deliver the assignment to the insurance company. Defendant refused to do so, and said that it probably would interfere with the settlement. Then Mr. Gibbs talked to representatives of the insurance company. Thereafter, the defendant told Mr. Gibbs that if he did not keep his nose out of defendant's business he would see that the grandson would not get any of the insurance money. Mr. Gibbs told defendant that he knew that the settlement was for $47,500 instead of $37,500. Defendant told him again to keep out of defendant's business.

Soon after the settlement was made, $250 was paid to the insurance agent. On August 13, defendant paid the $2,500 which was due on the Continental Thrift loan. Also on or about that date the defendant paid to Anthony Doria $21,500, the balance due to him.

After defendant was arrested on June 17, 1960, he told police officers that: prior to the flight the Mark 35 had been checked and it was in excellent condition—that it had 86 hours of flying time; the pins he pulled from the plane at Gibbs' direction were pieces of wire about 8 inches long,

about ¼ inch in diameter, and resembled a cotter pin; the purpose of the pins was to lock the landing gears in place so that they would not collapse when there was no pressure in the hydraulic system; after he pulled the pins he showed them to Gibbs so that he would know that the gears were free.

In a later part of that conversation an officer told defendant that the pins do not come out of a Mosquito landing gear, and that a witness saw defendant come out of the wheel wells without anything in his hands. Defendant replied that that was impossible because he remembered that he did pull the pins.

In another conversation, an officer told defendant that the officers knew that he had paid money to the insurance broker in order to get the policy paid fast. Defendant replied, "Oh, you know about that, too," and that he could not remember the exact amount but he would have a memorandum about it at his office.

Later, when they were at defendant's office, an officer asked him how much money he paid to the broker. He replied, "$1,500 . . . No, no, make it between a thousand and one thousand five hundred dollars." He also said that he could not find the memorandum and that he had thrown away a lot of papers concerning the incident.

Later, while returning to the police station, an officer told defendant that a person had said that defendant asked him how to burn a plane and get the insurance. Defendant said: "That was that dirty rat Martin Lencer," who suggested that he (defendant) wreck the plane by driving a truck into it. Later, the defendant denied that he paid $1,500 to the broker.

Defendant testified that he did not offer money to Brown or anyone if he would wreck the plane; he did not discuss running a truck into the plane; the plane had been registered at all picture studios in Los Angeles as being available for use in a picture—but that did not include wrecking the plane; the plane was insured for $50,000 by mutual agreement between him and Gibbs; he did not have any pliers in his possession on July 1, 1957; he did not cut any hydraulic line in either wheel well of the plane; he went into the wells to remove the pins, and he only removed the pins; the take off of the plane was normal, and there was no vapor trail or any abnormal appearance of the landing gear; after the plane was airborne he went to the shack, and about 25 minutes later he received a telephone call from the airport tower that the plane had crashed; he did not tell Taylor, nor Kerber Gibbs,

that he had advanced $1,500 to James Gibbs; he did not kill Gibbs or have anything to do with his death.

On cross-examination defendant testified that he purchased the Mark 35 for $8,000 but he testified before the Industrial Accident Commission that the purchase price was $22,500; the reason for such difference was that he added to the original price the amount he thought he might receive as a result of flying the plane; the balance sheet of Trans-World Engineering, which he submitted to the bonding company, showed total assets of $271,392.07—and the value of the Mark 35 as shown thereon was $90,000; that sheet also showed that the company owned four Mark 6 planes of the value of $140,000; that the values were arbitrary, i.e., the figures were "beefed up" or exaggerated; during the period of one and one-half years when the plane was not used he tried to sell it for $27,-500; he admitted, when testifying before the Industrial Accident Commission, that Trans-World Engineering never had more assets than the two planes and some government contracts; he was heavily in debt when he made arrangements for the test flight; he wrote a letter to Brown, the pilot, suggesting that they exchange letters optimistically setting forth their hopes in the aerial photography business; at the time of making the insurance settlement he knew that other "Mark 35's" were available in England.

Appellant contends, with reference to Count 1, that he did not commit any act with the intent of destroying the plane to defraud an insurance company. Section 548 of the Penal Code, referred to in Count 1, provides: "Every person who wilfully burns or in any other manner injures, destroys . . . or disposes of any property which at the time is insured against loss . . . by fire . . . or any casualty with intent to defraud . . . the insurer . . . is punishable by imprisonment in the state prison. . . ." Appellant argues that there was no proof of any act by him which could in any way contribute toward a violation of said section; and that, at most, there was mere conjecture as to what act there was on his part.

It was established that defendant's aerial photography business was a financial failure. He was indebted to several persons or companies in an aggregate amount of several thousands of dollars. He had lost the Mark 6 by repossession upon default in making payments on a loan, and he had lost his government contracts. The Mark 35 was chained to a fence and kept there for failure to pay parking and

service charges. He asked two pilots regarding methods of completely destroying an airplane. He offered one pilot $10,000 of proceeds of a $50,000 insurance policy if the pilot would fake a landing gear failure and then jump from the plane, allowing it to crash. On another occasion he offered to place a lien on insurance proceeds sufficient to secure a loan of money sufficient to get the plane into the jungles of Yucatan where the plane might be destroyed by belly landing on a beach. He offered an insurance agent one-half of a large policy of insurance if the agent would obtain the insurance and if the agent's brother would fly the plane and crash it. He tried to make arrangements with a picture studio so that the plane might be destroyed in a war scene. He told two persons that he was going to destroy the plane in order to collect the insurance money. He made an agreement with James Gibbs whereby Gibbs, as pilot, would receive 20 per cent of any insurance proceeds resulting from a plane crash. After making such an agreement, he obtained a $50,000 policy of insurance for a 30-day period. He discussed plans of painting the plane in order to create the impression that he did not intend to destroy the plane. After the crash, he attempted to prevent the father of James Gibbs from notifying the insurance company of the 20-per-cent agreement with James Gibbs. He insisted on prompt settlement of the policy so that he could pay debts. False statements were made by defendant in various representations.

The questions as to the acts of Defendant and as to his intent were questions of fact for the determination of the jury. ▮▮▮ "The intent to defraud is a question of fact to be determined from all the facts and circumstances of the case." (*People* v. *Caruso,* 176 Cal.App.2d 272, 278 [1 Cal. Rptr. 428].) ▮▮▮ The evidence was sufficient to support the conviction as to Count 1.

With reference to Count 2, appellant contends that there was no evidence that he filed a false or fraudulent claim. Section 556, subdivision (a), of the Insurance Code, referred to in Count 2, provides: "It is unlawful to: (a) Present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance." Appellant argues that the only basis for this charge must lie in the claimed value of the plane, but since the property was insured for "actual cash value" and the company had determined that value and paid it, there was no false or fraudulent claim. He argues further that the fact that he paid less for the plane

than its value or less than it was insured for is immaterial. The fact that the insurance company paid the claim is not determinative that the claim was not false or fraudulent. (See *People* v. *Ross,* 105 Cal.App.2d 235, 236-237 [233 P.2d 68].) The insurance company was required to pay only for the actual loss resulting from the destruction of the plane.

Defendant told the insurance adjuster that a similar plane was not available, but it appears that he knew that other Mark 35's were available in England. Also, during the month preceding the loss of his plane he had an option to sell a Mark 35, with photographic equipment, for $19,500, but it was not sold until long after this insurance settlement. After filing his proof of loss herein for $50,000 (less the $2,500 deductible), he testified before the Industrial Accident Commission that the value of the plane was $22,500. When he sought loans or insurance on the plane, he ''beefed up'' or exaggerated the value. It is also to be noted that the claim, as presented, stated that other than the defendant and Continental Thrift no person had any interest in the plane. Defendant did not tell the insurance company that Gibbs had a 20 per cent interest in the insurance on the plane. It is to be noted also that defendant did not want Gibbs' father to notify the company of Gibbs' interest, for the reason that it might interfere with the prompt settlement which he and the insurance agents were urging. The proof of loss also stated that the loss was not caused by design or procurement on the owner's part. The false nature of that statement is indicated by the discussion hereinabove regarding Count 1. Under said section 556 of the Insurance Code ''the writing required need not be false or fraudulent as long as it is intended to be presented or used in support of any false or fraudulent claim.'' (*People* v. *Zelver,* 135 Cal.App.2d 226, 235 [287 P.2d 183].) The evidence was sufficient to support the conviction as to Count 2.

With reference to Count 3, appellant contends there was no evidence of conspiracy to destroy insured property or to file a fraudulent claim. Defendant and Gibbs were in bad financial circumstances. They entered into the agreement whereby Gibbs had a lien of 20 per cent on insurance proceeds. Soon after making that agreement, Gibbs made a codicil to his will wherein he stated how his money should be distributed if he had $10,000 due to him. Gibbs also said that he was going to make a lot of money from the test flight. The discussion hereinabove relative to Counts 1 and 2 is applicable here. The

evidence was sufficient to support the conviction of conspiracy as alleged in Count 3.

The attempted appeal from the sentence is dismissed.

The judgment and the order denying the motion for a new trial are affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied September 24, 1962, and appellant's petition for a hearing by the Supreme Court was denied October 24, 1962.