[S. F. No. 22588. In Bank. Mar. 18, 1968.]

LEONARD EUGENE MAINE, Petitioner, v. THE SUPE-
RIOR COURT OF MENDOCINO COUNTY, Respond-
ent; THE PEOPLE, Real Party in Interest.

[S. F. No. 22589. In Bank. Mar. 18, 1968.]

THOMAS EUGENE BRAUN, Petitioner, v. THE SUPE-
RIOR COURT OF MENDOCINO COUNTY, Respond-
ent; THE PEOPLE, Real Party in Interest.

John W. Poulos and Merle P. Orchard, under appointments by the Supreme Court, and Newell Rawles for Petitioners.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Edward P. O'Brien and Derald E. Granberg, Deputy Attorneys General, for Respondent and Real Party in Interest.

MOSK, J.—Petitioners, Leonard E. Maine and Thomas E. Braun, seek writs of mandate directed to the Superior Court of the County of Mendocino. By grand jury indictment they are each accused of murder (Pen. Code, § 187), two counts of kidnaping (Pen. Code, § 207), forcible rape (Pen. Code, § 261, subd. 4) and assault with intent to commit murder (Pen. Code, § 217). Petitioners each filed a timely motion under section 1033 of the Penal Code for a change of venue on the ground that a fair and impartial trial could not be had in Mendocino County.[1] The trial court found there could be a fair and impartial trial and denied the motions.

In this proceeding petitioners request that we review the trial court's orders and direct that the venue be changed. The case at bench is one of first impression in this jurisdiction; this court has not heretofore entertained applications for mandamus relief before trial to compel a change of venue. As

---

[1]Section 1033 of the Penal Code provides: "A criminal action pending in a superior court may be removed from the court in which it is pending on application of the defendant, on the ground that a fair and impartial trial cannot be had in the county. This chapter does not apply to actions pending in other courts."

378

will appear, we conclude that mandate lies to test a non-appealable order denying a change of venue; we further conclude that petitioners' affidavits and exhibits persuasively demonstrate the need in this case for the mandamus relief requested.

I

While mandate has not been employed previously to compel a change of venue, the remedy has been adapted to a spectrum of pretrial circumstances and in each instance was found to be consistent with traditional criteria for issuance of the extraordinary writ. We deemed mandate a proper procedure to require a trial court to give a defendant before trial an opportunity to inspect and copy statements made by him to law enforcement officers (*Cash* v. *Superior Court* (1959) 53 Cal.2d 72, 75 [346 P.2d 407]; *Powell* v. *Superior Court* (1957) 48 Cal.2d 704, 707 [312 P.2d 698]) and to have the benefit of discovery of other prosecution evidence (*Funk* v. *Superior Court* (1959) 52 Cal.2d 423 [340 P.2d 593]). Mandate has been considered appropriate to compel a trial court to permit hypnotic examination of a defendant in order to adequately prepare for trial (*Cornell* v. *Superior Court* (1959) 52 Cal.2d 99 [338 P.2d 447, 72 A.L.R.2d 1116]); to compel dismissal of a criminal action not brought to trial within the time required by law (*Harris* v. *Municipal Court* (1930) 209 Cal. 55 [285 P. 699]); to compel dismissal where a defendant has been denied the constitutional right to a speedy trial (*Zamloch* v. *Municipal Court* (1951) 106 Cal.App.2d 260 [235 P.2d 25]); and on two occasions reviewing courts have employed mandamus to require transfer of a case from one court to another (*Gomez* v. *Superior Court* (1958) 50 Cal.2d 640 [328 P.2d 976]; *Smith* v. *Municipal Court* (1959) 167 Cal.App.2d 534 [334 P.2d 931]).

 The common thread woven through the foregoing examples of mandamus antedating trial is the responsiveness of appellate tribunals when initiative is required to protect a defendant's fundamental right to a fair trial. Availability of appeal often falls short of sufficient protection, since "the burden, expense and delay involved in a trial render an appeal from an eventual judgment an inadequate remedy." (*Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 562 [212 P.2d 878].)[2]

---

[2]For an early discourse on mandamus, albeit in a civil case, see *Wood* v. *Strother* (1888) 76 Cal. 545, 554 [18 P. 766, 9 Am.St.Rep. 249]. "The

It is neither novel nor inappropriate, therefore, for this court to review through a mandate proceeding a pretrial order which is likely to substantially affect a defendant's right to a fair trial. In civil actions, furthermore, the Legislature in 1961 enacted a specific provision making mandate available to review trial court orders granting or denying a change of venue. (Code Civ. Proc., § 400.) *A fortiori* similar review should apply to assure a fair trial in criminal cases where life and liberty are the premium.

But the People, who are the real party in interest, insist that mandate should not lie "for very practical reasons": first, mandamus review will unduly prolong trial settings because most defendants will seek a writ of mandate if their motion for change of venue is denied; second, the present petitioners have an adequate remedy at law because the trial court denied their motion without prejudice to its renewal in the event that *voir dire* examination of prospective jurors indicates that it is impossible to empanel a fair and impartial jury. We find neither of these contentions persuasive.

Conceding that some defendants who unsuccessfully seek a change of venue at the trial level will apply for a writ of mandate in appellate courts, the delay in the commencement of their trials will not be significant.[3] ▇ If the applications are frivolous or dilatory, the reviewing court may summarily deny relief. On the other hand, if the application has merit, the reviewing court must either grant the writ or issue a show cause order. (Cal. Rules of Court, rule 56(c).) Any delay that occurs pending appellate determination will be compensated in most cases, should the defendant be found guilty after a long and costly trial, by providing a substantial safeguard against subsequent reversal on appeal for failure to have changed the venue. We do not foresee, in short, that mandamus proceedings to compel a change of venue will deleteriously affect the administration of justice.[4]

---

writ issues,'' said this court, ''. . . to prevent a failure of justice. And this is its ancient office. In the language of Lord Mansfield: 'It was introduced to prevent disorder from a failure of justice and defect of police. Therefore, it ought to be used upon all occasions where the law has established no specific remedy, and where, in justice and good government, there ought to be one.' ''

[3]We do not anticipate this to be a universal practice in the future. Most defendants are charged with crimes in their home communities and logically would prefer to be tried in a familiar environment convenient to their families, friends and witnesses. If local counsel is engaged, he too would generally choose to try the case in a court not distant from his office.

[4]We thus bring our procedure into conformity with one of the recom-

The People also contend that petitioners Maine and Braun have an adequate remedy at law in that the trial court denied their motion for a change of venue without prejudice to its renewal ''if the facts should so warrant.'' It has long been the practice, sanctioned in the decisions of this court (see, e.g., *People* v. *Kromphold* (1916) 172 Cal. 512 [157 P. 599]), to permit the trial court to defer its final ruling on a motion for a change of venue until the jury is empaneled. The trial court can thereby take into consideration any unanticipated difficulties encountered during *voir dire* examination of prospective jurors.

Experience shows, however, that trial courts are often reluctant to order a venue change after a jury has been empaneled. Defense counsel, moreover, is placed in an unnecessarily awkward position: unless he exhausts all his peremptory challenges he cannot claim on appeal, in the absence of a specific showing of prejudice, that the jury was not impartial. Yet, convinced that he must go to trial because his motion for a venue change was at first denied and in all likelihood will not ultimately prevail, he may fail to use every peremptory challenge sensing that the jurors he has examined may be comparatively less biased than others who might be seated were his peremptory challenges exhausted. (See *People* v. *Modesto* (1967) 66 Cal.2d 695, 705 [59 Cal.Rptr. 124, 427 P.2d 788].) In an antagonistic atmosphere ''there will remain the problem of obtaining accurate answers on *voir dire*—is the juror consciously or subconsciously harboring prejudice against the accused resulting from widespread news coverage in the community.''[5] ▮ We can only conclude that the

mendations of the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (1966). This report, commonly (and hereinafter) called the Reardon Report, was recently approved by the House of Delegates of the American Bar Association. The timing of appellate review receives detailed consideration in the commentary on recommendations: ''If an appeal from a clearly erroneous denial of a motion for continuance or change of venue is postponed until after trial, a great deal of time and effort will have been wasted, and the appellate court may be extremely reluctant to reverse. On the other hand, frivolous appeals are time-consuming in themselves and may be used solely for purposes of delay. The Committee believes that the solution lies in allowing discretionary interlocutory appeals or in the use of an extraordinary writ such as mandamus, with a procedure for prompt disposition on the papers of cases that lack merit.'' (Reardon Report, at pp. 127-128.)

[5]Reardon Report, at p. 127. The report discusses in a similar vein the defense attorney's predicament. See also Note, *Fair Trial v. Free Press: The Psychological Effect of Pre-Trial Publicity on the Juror's Ability to be Impartial; A Plea for Reform* (1965) 38 So.Cal.L.Rev. 672.

naked right to renew the motion for change of venue is not an adequate remedy at law to require denial of a mandamus petition.

██ It would be inopportune, of course, to permit a defendant to seek mandamus during or after empaneling the jury. (Cf. *People* v. *Wilson* (1963) 60 Cal.2d 139, 149 [32 Cal. Rptr. 44, 383 P.2d 452].) Due regard for the orderly progress of a trial dictates that a defendant apply for a writ of mandate in advance of trial so that, if the application appears meritorious the appellate court pending its own decision can stay the trial court proceeding. If the appellate court denies the application or if appellate review is not sought, defense counsel can continue under the previous practice, to renew his motion for a change of venue during or after the *voir dire* examination of prospective jurors, and the trial court should order a venue change if the situation so merits.

In holding that mandate lies to review a denial of a motion for a change of venue, we are in accord with the rationale of the Minnesota Supreme Court, which has long held mandate to be an expeditious vehicle to compel an appropriate venue change: "it is proper, and often preferable, to determine the place of trial prior to the actual trial of the case rather than afterwards." (*State* v. *Thompson* (1963) 266 Minn. 385, 386 [123 N.W.2d 378, 380].)

## II

Our next point of inquiry is the test to be applied in mandamus proceedings designed to compel a change of venue. ██ Ordinarily we are reluctant to depart from the sound principle invariably pronounced that mandate lies not to control an exercise of discretion but only to correct an abuse of discretion. Very early decisions of this court have recognized that the trial court's discretion is not absolute. (*People* v. *Lee* (1855) 5 Cal. 353, 354; *People* v. *Yoakum* (1879) 53 Cal. 566, 567.) In *Yoakum* this court said: "The discretion of the Court invoked by the application [for a venue change] is not, however, a mere arbitrary discretion, but a discretion the exercise of which must be reasonable." While we have thus held that the discretion must be reasonably exercised and will be subject to review on appeal for abuse, we have upheld the trial court's ruling whenever we were unprepared "to say that the trial court abused the discretion vested in it when it denied the motion for change of venue." (*People* v. *Hall* (1934) 220 Cal. 166, 170 [30 P.2d 23, 996]; for a later case to

the same effect, see *People* v. *Duncan* (1960) 53 Cal.2d 803, 812 [3 Cal.Rptr. 351, 350 P.2d 103].)

This traditional approach, however, is no longer adequate since *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507]. In extending the nature of the inquiry far beyond the validity of trial court discretion, the United States Supreme Court stated that ''appellate tribunals have the duty to make an *independent evaluation* of the circumstances'' (italics added), an unmistakable implication that appellate courts must, when their aid is properly invoked, satisfy themselves *de novo* on all the exhibits and affidavits that every defendant obtains a fair and impartial trial.

Although we have reversed judgments of conviction on but four occasions (*People* v. *Lee* (1855) *supra,* 5 Cal. 353; *People* v. *Yoakum* (1879) *supra,* 53 Cal. 566; *People* v. *Suesser* (1901) 132 Cal. 631 [64 P. 1095]; *People* v. *McKay* (1951) 37 Cal.2d 792 [236 P.2d 145]), many cases have presented serious constitutional issues arising out of prejudicial newspaper publicity which either caused or reflected widespread hostility to a defendant in the community. (See, e.g., *People* v. *Stroble* (1951) 36 Cal.2d 615 [226 P.2d 330], affd. sub nom. *Stroble* v. *California* (1952) 343 U.S. 181 [96 L.Ed. 872, 72 S.Ct. 599].)[6] In such cases the offenses committed were often bestial and heinous, and the discovery of the crimes as well as the unfolding of subsequent events inevitably received abundant attention in the communications media. But as the New Jersey Supreme Court said in a landmark case, ''[The defendant expresses] grave doubt that jurors who are subjected to pretrial publicity seriously adverse to a defendant's interests can efface it altogether from their conscious and unconscious minds, no matter how hard they try to do so. The law must be sympathetic to that viewpoint, and must make the sympathy meaningful in a practical world of public trials.'' (*State* v. *Van Duyne* (1964) 43 N.J. 369, 386 [204 A.2d 841, 850, 11 A.L.R.3d 1086, 1099-1100].) In many cases that are the focus of unusual public attention, the effect of prejudicial pretrial disclosures or widespread community

---

[6]In the history of California 66 cases have involved a venue issue on appeal. In only four were convictions reversed. Defendants read that fact to indicate an abdication of responsibility by appellate courts, after a conviction, to assess the original propriety of the trial venue. The People view the statistical odds as confirming the objectivity of trial judges in determining that a fair trial was possible. We need not resolve that intriguing debate.

antagonism can be substantially overcome by a change of venue.[7] This end can most readily be served by delineating with greater specificity the standard of reasonableness that should guide trial courts in the exercise of their discretion on a motion for a venue change and appellate courts, if pretrial review by mandamus is sought, in making their own independent review of the affidavits and exhibits.

After long study the American Bar Association has tendered proposals for judicial consideration which should contribute toward freeing criminal trials from the taint of partiality. The Reardon Report (*ante*, fn. 4), which embodies these proposals, details a comprehensive standard relating to motions for change of venue or continuance which we now consider authoritative. Section 3.2(c), entitled "Standards for granting the motion," provides: "A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved. A showing of actual prejudice shall not be required."[8]

The foregoing standard is fashioned on those suggested by the United States Supreme Court in *Sheppard* v. *Maxwell* (1966) *supra,* 384 U.S. 333, 363 [16 L.Ed.2d 600, 620]. "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial," the Supreme Court wrote, "the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." While the Supreme Court explicitly declined to rest its reversal in *Sheppard* on the pretrial publicity, the court's noticeable sensitivity to potentially

[7]See *Free Press and Fair Trial* (1967), a document issued by the American Newspaper Publishers Association, criticizing phases of the Reardon Report with which we are not here concerned. At page 38, the publishers assert that publicity does not leave those accused of a crime "entirely at the mercy of the newspapers" since there are adequate safeguards in our judicial system. The first enumerated safeguard upon which they rely is "change of venue": the case is to be moved to another locality if "pretrial publicity" has made it "difficult or impossible for the accused to obtain a fair trial."

[8]To the extent that it is contrary, footnote 2 in *People* v. *Modesto* (1967) 66 Cal.2d 695, 705 [59 Cal.Rptr. 124, 427 P.2d 788], is disapproved.

prejudicial pretrial publicity and disclosures (see, e.g., *Estes v. Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628], and *Rideau* v. *Louisiana* (1963) 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417]) has rendered imperative the implementation of the standard governing change of venue or continuance recommended in the Reardon Report. Employment of this standard by trial courts should minimize the number of cases coming before appellate courts, in mandamus proceedings and on appeal, where a prominent contention is that a fair and impartial trial could not be had; by reducing a significant source of asserted error, this standard likewise lessens the risk of reversal and thus promotes the efficient administration of justice.

In applying this standard henceforth,[9] we further effectuate, in light of present experience, the requirement basic to our jurisprudence that every person accused of crime is entitled to a trial by a fair and impartial jury. ''The prisoner, whether guilty or not, is unquestionably entitled by the law of the land to have a fair and impartial trial. Unless this result be attained, one of the most important purposes for which Government is organized and Courts of Justice established will have definitively failed.'' (*People* v. *Yoakum* (1879) *supra*, 53 Cal. 566, 571.) ''The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print. . . . When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied.'' (*Patterson* v. *Colorado* (1907) 205 U.S. 454, 462-463 [51 L.Ed. 879, 881, 27 S.Ct. 556] (Holmes, J.).)

### III

Bearing in mind the further admonition in *Sheppard* that ''reversals are but palliatives'' and that ''the cure lies in those remedial measures that will prevent the prejudice at its inception'' (*Sheppard* v. *Maxwell* (1966) *supra*, 384 U.S. 333, 363 [16 L.Ed.2d 600, 620]), we next proceed to determine by our independent evaluation of all circumstances in this

[9]The standard discussed herein will be applied on direct review in all cases which have not proceeded to trial at the date this opinion becomes final. (See *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21], and cases cited.)

case whether there is a reasonable likelihood that a fair trial cannot be had in the present forum.

In the case at bench petitioners are accused of crimes of the gravest consequence. They are strangers to Ukiah, a small community where they have been held for trial. On the other hand, the two victims, a popular teenage couple from respected families in the area, were assaulted under circumstances that would compel any community's shock and indignation. Since the case has not progressed beyond the pretrial stage it would be inappropriate for us to comment on the evidence that may unfold at the trial. We confine our discussion to a few uncontradicted illustrations which demonstrate a reasonable likelihood that petitioners cannot receive a fair trial in Mendocino County.

One of the victims, the girl, was discovered on a public road nearly unconscious with bullet wounds about her neck and head. Her condition was critical and several complicated operations were performed to save her life. Local citizens immediately organized a fund to help the girl's parents defray the medical expenses, and the Ukiah Daily Journal, the local newspaper, urged every citizen to contribute. It is no small measure of the community's laudable warmth and generosity that a substantial sum was quickly raised, mostly in modest contributions. We do not hold it to be an invariable rule that sympathy for a victim demonstrates antipathy to the alleged perpetrators of an offense. But such pervasive civic involvement in the fate of a victim, particularly when the events all transpire in a relatively small community,[10] is a strong indication that the venue should be changed.[11]

We recognize that from the outset of the investigation the local law enforcement authorities scrupulously avoided divulging any details of the crime. Both the Ukiah Daily Journal and the Santa Rosa Press Democrat, which extensively reported the case to residents of Mendocino County and vicinity, noted that the sheriff and district attorney were

---

[10]The 1960 population of Ukiah, the county seat of Mendocino County, was 9,900. The entire population of Mendocino County is 51,200; the county ranks 34th of California's 58 counties. (See Appendix A, *Whittaker* v. *Superior Court* (1968) *ante,* pp. 357, 373 [66 Cal.Rptr. 710, 438 P.2d 358].)

[11]The People rely on *People* v. *Burwell* (1955) 44 Cal.2d 16, 29 [279 P.2d 744], for authority that community generosity toward the victims of a crime is not per se sufficient to warrant a venue change. *Burwell* was not decided under the standard announced in this opinion, and, in addition, took place in a county adjacent to a large metropolitan area.

"extremely close-mouthed on any details." Their commendable efforts in this regard, however, were frustrated by other authorities who talked freely with representatives of the press and other news media about the crime. Principally at fault appears to be an official of the State of Washington, where petitioners are also charged with murder, who revealed that one of the petitioners had confessed and placed full responsibility on the other for the crimes. This disclosure received substantial attention in the local newspaper, and it is undoubted that the existence of a confession is now common knowledge in the community. The admissibility of the confession into evidence has not been tested in a judicial hearing, however, and its premature release must be regarded as potentially prejudicial to petitioners. When such a disclosure occurs in a small community, the only effective remedy, if the defense so requests, is to change the venue.[12] Indeed, failure to seek a change of venue may suggest to a reviewing court on appeal that no prejudice was suffered by the defendant. In *Stroble* v. *California* (1952) *supra,* 343 U.S. 181, 194 [96 L.Ed. 872, 883], Justice Clark wrote: "But, in an effort to determine whether there was public hysteria or widespread community prejudice against petitioner at the time of his trial, we think it significant that two deputy public defenders who were vigorous in petitioner's defense throughout the trial, saw no occasion to seek a transfer of the action to another county on the ground that prejudicial newspaper accounts had made it impossible for petitioner to obtain a fair trail in the Superior Court of Los Angeles County." (But compare *Delaney* v. *United States* (1st Cir. 1952) 199 F.2d 107, 115.)

Finally, this case has to some extent become involved in county politics. The district attorney disqualified Judge Winslow, an experienced trial judge, whom he is opposing on the June 1968 election ballot. The People do not deny that politi-

---

[12]In this connection we observe that the Reardon Report urges the adoption of a rule of court to govern the release of information by law enforcement officers. The rule recommended in the report provides, inter alia: "From the time of arrest, issuance of an arrest warrant, or the filing of any complaint, information, or indictment in any criminal matter within the jurisdiction of this court, until the completion of trial or disposition without trial, no law enforcement officer subject to the jurisdiction of this court shall release or authorize the release of any extrajudicial statement, for dissemination by any means of public communication, relating to that matter and concerning: . . . (2) the existence or contents of any confession, admission, or statement given by the defendant, or the refusal or failure of the defendant to make any statement; . . ."

cal factors might have influenced the district attorney's decision, but contend that since a judge from outside the county has now been assigned to hear the case, petitioners' right to a fair trial will not be infringed. The People also note that counsel for one of the petitioners has announced his candidacy for the same judgeship, but assert their belief that the assigned trial judge can exercise effective control over both the district attorney and the defense counsel. Under these circumstances, nevertheless, we harbor a gnawing fear that the campaign competition between two election adversaries might inadvertently intrude during the course of a proceeding in which they are also trial adversaries. ■ Political factors have no place in a criminal proceeding, and when they are likely to appear, as here, they constitute an independent reason for a venue change. A "hotly contested election," we note, was a circumstance in *Sheppard* v. *Maxwell* (1966) *supra*, 384 U.S. 333, 354 [16 L.Ed.2d 600, 615]. (See also, *Delaney* v. *United States* (1st Cir. 1952) *supra*, 199 F.2d 107, 115.)

■ The People insist that sufficient time has now elapsed since the date of petitioners' arrest that any prejudice they might have suffered has been dissipated. Under the circumstances of the case at bench this position is not persuasive. While a lengthy continuance might sufficiently protect the accused in some cases, it does not do so here. Delays may be an efficacious antidote to publicity in medium-size and large cities,[13] but in small communities, where a major crime becomes embedded in the public consciousness, their effectiveness is greatly diminished. (See Friendly and Goldfarb, Crime and Publicity (1967), p. 79.)[14] As Justice Frankfurter wrote in his dissenting opinion in *Stroble* v. *California* (1952) *supra*, 343 U.S. 181, 201 [96 L.Ed. 872, 886] : "Science with all its advances has not given us instruments for determining when the impact of such newspaper exploitation has spent itself or whether the powerful impression bound to be made by such inflaming articles as here preceded the trial can be dissipated in the mind of the average juror by the tame and often pedestrian proceedings in court." Any lingering doubt

[13]We do not intend to suggest, however, that a large city may not also become so hostile to a defendant as to make a fair trial unlikely.

[14]In 1966, the last year for which complete figures are available, the Bureau of Criminal Statistics reports no complaints for murder or manslaughter were filed in Mendocino County. By contrast, for the same year, there were 48 filings for murder and manslaughter in San Francisco County and 38 in Alameda County.

about the effectiveness of a continuance should be resolved in favor of a venue change. (See *People* v. *Suesser* (1901) *supra,* 132 Cal. 631, 635.)

We do not assert categorically that each individual circumstance here, isolated and alone, would compel a change of venue. It may do so, or may not, depending upon the extent of the hostility engendered toward a defendant, and to some extent upon the sophistication of the community. Generally no single indicium is available as a barometer of the public mind.

We hold that where, as here, the defendants are friendless in the community, the victims prominent, the occurrence of the crime probably fortuitous as to locale, community-wide interest and generosity are expressed on behalf of the victim, newspaper publicity includes accounts of a purported confession, and two opposing counsel are also election opponents, a change of venue is clearly necessary to assure a fair trial to the defendants.

It is now incumbent upon the parties to suggest a convenient site for a fair trail. In a case of this nature it would probably be prudent to transfer the cause to a metropolitan area where comparatively little difficulty will be encountered in empaneling a jury free from any kind of prejudgment. In the instant case, for example, it might not be inappropriate to select one of the cities in the San Francisco Bay area. We leave this determination, however, to the trial court since it is in a better position to weigh the various factors bearing on the selection of a fair trial forum in ''some convenient county free from a like objection.'' (Pen. Code, § 1035.)

Let peremptory writs of mandate issue directing the Superior Court of Mendocino County to grant the motions for change of venue, hold a hearing to determine a place where a fair and impartial trial can be had, and transfer the cause to that place.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied April 17, 1968.