[Civ. No. 1349. Fifth Dist. Aug. 17, 1970.]

BETTY LOUISE LANSDOWN, Petitioner, v.
THE SUPERIOR COURT OF KERN COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## Counsel

James G. Bowles, for Petitioner.

No appearance for Respondent.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Arnold O. Overoye, Deputy Attorneys General, for Real Party in Interest.

## Opinion

**STONE, P. J.**—This matter is before us on a writ of mandate to compel change of venue from the Superior Court of Kern County. Petitioner, Betty Louise Lansdown, also known as Betty Louise Fouquet, and also known as Betty Louise Baker, is charged with violation of Penal Code section 273a, subdivision (1), wilful child abuse, and of Penal Code, section 271, desertion of a child under 14 years of age. The ground for her motion is that prejudicial publicity has made it impossible for her to receive a fair and impartial trial by jury in Kern County.

In *Maine* v. *Superior Court,* 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], the court reviewed the propriety of mandamus as a proper procedure, before trial, for seeking a review of a pretrial order denying a change of venue upon the ground that prejudicial pretrial publicity has adversely affected a defendant's right to a fair and impartial trial. The court held mandamus is a proper remedy in such cases. Further, that in keeping with *Sheppard* v. *Maxwell,* 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507] in such a proceeding the appellate tribunal is under a duty to make an independent evaluation of the circumstances, that is, "appellate courts must, when their aid is properly invoked, satisfy themselves de novo on all the exhibits and affidavits that every defendant obtains a fair and impartial trial." (P. 382.)

Petitioner and her common-law husband, Ronald Fouquet, are accused of abandoning their four-year-old daughter, Jody, at the side of Highway 99, south of Bakersfield. The child was found clinging to the right-of-way chain-link fence in the early morning hours of October 25, 1969. Apparently her parents had conditioned her to say that her name was Jody Smith, and that she lived in Bakersfield. The plight of the child brought much publicity, since no one claimed her and the authorities were unable to trace her family or locate anyone who knew her. A former babysitter for

the Fouquets in the Los Angeles area read about the child and advised officials she believed Jody to be Jody Fouquet, and revealed the location of the Fouquet home near Los Angeles. Through this lead, the officers were able to establish that Jody Smith was indeed Jody Fouquet, that her mother was Betty Louise Lansdown and her father was Ronald Fouquet, and that the two had been living together in a common-law marriage relationship.

Understandably, Kern County and Los Angeles newspapers and radio and television stations gave much publicity to the case. The abandonment of the child during the cold, early morning hours, on a busy highway in a desolate area south of the City of Bakersfield was covered in detail. This alone would not justify a change of venue, even though people in the community were naturally sympathetic toward the child who suffered the harrowing experience, and were indignant at the apparent callousness of the mother and father. However, a different kind of publicity appeared when an investigation developed that Jody's older brother, Jeffrey, was missing and indications were that he might have been murdered.

Jeffrey's whereabouts remained a mystery for a time, and some editors and commentators called upon petitioner to tell what she knew about the child's disappearance. Also, vilifying letters were written to her. Perhaps the most unusual development of this aspect of the case was the open attack upon petitioner's attorney. The following item was broadcast by Bakersfield radio station KAFY once every hour from 6 p.m. Monday, November 10, through 5 p.m. November 11: "An open letter to Jim Bowles, attorney for Betty Lansdown Fouquet, the mother of little Jeffrey Lansdown. Mr. Bowles, KAFY understands the time honored attorney-client relationship and the fact that you have advised Mrs. Fouquet not to answer any questions concerning the whereabouts of little eight-year-old Jeffrey. Mr. Bowles, a little boy's life might be at stake. You were quoted over the weekend as saying you did not think Mrs. Fouquet knew the whereabouts of Jeffrey. Mr. Bowles, let a mother answer for herself. If, indeed, her answers would incriminate her, then ask her yourself during one of your confidential-client discussions and you, Mr. Bowles, institute some kind of action to find Jeffrey. Whatever happens, Mr. Bowles, no one is more responsible for the fact that Jeffrey cannot be found than you are. Act now, Mr. Bowles, allow Mrs. Fouquet to answer the question— 'Where is Jeffrey?' "

The body of Jeffrey was eventually discovered, and Fouquet was charged with murder. Numerous television and radio broadcasts originating in Los Angeles, where Fouquet was tried for the boy's murder, and in Bakersfield,

where petitioner was being held on child abandonment charges, related the gruesome details of the boy's murder by torture. Most of them related that petitioner was present, and not only failed to notify authorities but helped dispose of Jeffrey's body.

The materiality of this publicity insofar as change of venue is concerned is that many of these news stories mentioned the Kern County case in context with the murder case. The news reports, radio transcripts and TV films are too numerous to incorporate in this opinion but, as an example, the following was broadcast by KBAK-TV on April 6, 1970: "Betty Lansdown Fouquet has testified in Los Angeles that her husband jumped on her five-year-old son's abdomen for thirty seconds, then stuffed little Jeffrey's body into a suitcase. The 26-year-old Mrs. Fouquet took the stand in the Superior Court trial of 31-year-old Ronald Fouquet. She told the jury she witnessed her son's death. She added that she accompanied her husband to a canyon north of Los Angeles and threw the nude body of Jeffrey over a cliff where it was found a month later by a hunter."

This was followed the next day, April 7, 1970, by the following broadcast on radio station KUZZ: "The stepfather of a five-year-old boy jumped up and down on his stomach for 30 seconds and settled down with a cold beer to watch him die. That was the testimony of Mrs. Betty Lansdown Fouquet at the murder trial of Ronald Fouquet in Los Angeles. The boy's mother said she tried to give her son, Jeffrey, artificial respiration but Fouquet told her to 'knock it off.' Fouquet is charged with the murder of Jeffrey in 1966. The mother said Fouquet not only beat the child but forced him to stand in a corner for days at a time with his wrists tied to a door knob. Mrs. Fouquet and her common-law husband are awaiting trial on charges of abandoning another of her children on a freeway last October."

On April 21, 1970, KERO-TV reported: "With the conviction of Ronald Fouquet on a first degree murder charge, yesterday in Los Angeles, thoughts now turn to the return of his common-law wife to Bakersfield. Betty Lansdown Fouquet will stand trial here on a charge of abandoning her five-year-old daughter Jody, last October, on Freeway 99 south of Bakersfield. The Fouquet woman's Bakersfield attorney is Jim Bowles, who talked with channel 23's Dick Jamison this afternoon. They discussed the murder conviction of Ronald Fouquet in the brutal killing of Jody's five-year-old brother Jeffrey in 1966."

▇▇▇▇ Our de novo examination of the record and the exhibits reveals three factors which bring the case within the rationale of *Maine* v. *Superior Court, supra,* and its progeny. (A) Publicity about the child abandonment upon which petitioner is to be tried, has been enmeshed in publicity

concerning her involvement in a revolting murder of another of her children, and continued until within two months of the date set for her trial. (B) Publication of a confession by Ronald Fouquet implicating petitioner in the commission of the charges for which she is to be tried. The confession, which real party in interest concedes cannot be used against petitioner, was given publicity in the Kern County area. (C) The attorney appointed to represent petitioner was publicly upbraided for permitting his client to exercise a constitutional right.

The standard against which we measure the record is articulated in *Fain* v. *Superior Court,* 2 Cal.3d 46, 51 [84 Cal.Rptr. 135, 465 P.2d 23]: "In making that appraisal the courts must now apply the standard we adopted in *Maine* (at p. 383): ' "A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a *reasonable likelihood* that in the absence of such relief, a fair trial cannot be had. . . . A showing of actual prejudice shall not be required." ' "

We conclude that there is a reasonable likelihood that petitioner cannot receive a fair trial in Kern County, not because the prospective jurors of that county intentionally would be unfair, but because it is unlikely they would be able to completely remove from their minds, subconsciously, at least, the publicity concerning the murder of Jeffrey, if called upon to try petitioner upon charges of willful abuse of Jody and deserting a child under 14 years of age.

Real party in interest would distinguish *Maine* (Mendocino County) and *Fain* (Stanislaus County) from this case, upon the ground of population; that is, prejudicial publicity is less likely to be widely heard, read and seen in a metropolitan area than in a rural area and, by corollary, it is more likely to be forgotten in a metropolitan area where sensational crimes are more commonplace than in a rural area.

Population, qua population, is not alone determinative; it is but one factor and it must be shown how size, whether of area or of population, neutralizes or dilutes the impact of adverse publicity. It was not demonstrated here. Kern County, though larger than Mendocino and Stanislaus Counties, has only one metropolitan area surrounding the county seat, known as "Greater Bakersfield." In this respect Kern County is not so different from Stanislaus as to distinguish the impact of publicity upon its citizens. It is likely that prospective jurors in the rural parts of the county, as well as in the city, read the single daily paper, the Bakersfield Californian, view television newscasts, and listen to radio broadcasts. In view of the unusual nature of the case, to assume, as does real party in interest,

that the spectacular news stories, pictures and broadcasts revealing that Mrs. Lansdown witnessed the brutal murder of Jeffrey and helped to dispose of his body by throwing it over a cliff, came to the attention of only the urban dwellers of the county, seems unrealistic. We doubt that the various news media would agree that their news dissemination is so ineffective.

Both sides took polls of public opinion to support their respective positions on the motion for change of venue. Petitioner polled 31 people; the district attorney polled 56 and obtained 23 affidavits. Since both sides polled only 84 people in a county having a population in excess of 300,000, we place little reliance on those results. The polls were conducted by persons interested in a particular outcome, and to say that one so circumstanced can address questions and give explanations to those interviewed without at least subconsciously setting the framework for a favorable response, is to ignore the facts of life.

Let a peremptory writ of mandate issue directing the Superior Court of Kern County to grant the motion for change of venue, to hold a hearing to determine a place where a fair and impartial trial can be had, and transfer the cause to that place.

Gargano, J., and Ginsburg, J.,* concurred.

A petition for a rehearing was denied September 14, 1970, and the petition of the real party in interest for a hearing by the Supreme Court was denied October 15, 1970.

*Assigned by the Chairman of the Judicial Council.