**Joaquim CONDE, Plaintiff, Appellee,**

v.

**STARLIGHT I, INC., Defendant, Appellant.**

**Joaquim CONDE, Plaintiff, Appellant,**

v.

**STARLIGHT I, INC., Defendant, Appellee.**

**Nos. 96–1089, 96–1209.**

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1996.

Decided Jan. 9, 1997.

212

Thomas E. Clinton, with whom Kathleen B. Carr and Clinton & Muzyka, P.C. were on brief, Boston, MA, for Starlight I, Inc.

David F. Anderson, with whom Latti Associates was on brief, Boston, MA, for Joaquim Conde.

Before CYR, BOUDIN and Lynch, Circuit Judges.

CYR, Circuit Judge.

Plaintiff-appellee Joaquim Conde sustained a permanent injury to his left hand on August 13, 1988, while serving as first mate aboard the commercial fishing vessel F/V ALENTEJO which was navigating in rough waters east of Nantucket on the Georges Bank.[1] Two days after the accident, Edward Monteiro, an adjuster for the ALENTEJO's insurer, obtained an oral statement from Conde in Portuguese. Since Conde could speak little English and was unable to read it, Monteiro purported to translate the written English statement back to Conde in Portuguese. Unbeknownst to Conde, the statement he signed indicated that the ALENTEJO had been travelling at slow speed when the accident occurred and it makes no mention of other critical facts about which Conde had informed Monteiro in his interview. For instance, the written statement omits any reference to the captain's refusal to slow the vessel and lower the fishing net to deck-level so that Conde and his fellow worker would not have to stand on the slippery deck, from which tiles were missing, while repairing the net.

In September 1990, Conde brought the present action for negligence and unseaworthiness against appellant Starlight I, Inc., owner of the ALENTEJO. *See* 46 U.S.C.App. § 688 (Jones Act); *Miles v. Apex Marine Corp.*, 498 U.S. 19, 29, 111 S.Ct. 317, 323–24, 112 L.Ed.2d 275 (1990) (unseaworthiness). At trial, the defense relied heavily upon the apparent discrepancies between Conde's trial testimony and the written statement he unwittingly gave to Monteiro, the adjuster. Conde, on the other hand, contended that Starlight and Monteiro, anticipating litigation, had collaborated to misrepresent the oral statement Conde made to Monteiro.

After the jury awarded Conde $350,000 in damages, the district court granted a new trial due to improper closing argument by Conde's counsel. The second trial resulted in a $968,500 award to Conde: $118,500 for past economic loss; $50,000 for pain and

1. Almost six years later, Conde obtained a non-maritime factory job at a reduced salary.

suffering; and $800,000 for future economic loss. The district court denied Starlight's second motion for new trial, subject to Conde's agreement to remit all damages for future economic loss above $254,212.50. On appeal, Starlight challenges both the denial of its second motion for new trial and the amount of the remittitur.[2]

### I. *Second Motion for New Trial*

Starlight contends that four improper statements by Conde's counsel in closing argument warrant yet a third trial. First, counsel observed, without evidentiary support, that Monteiro and defense attorney Thomas Clinton, Esquire, were "friends" and had "been working together for twenty years." Starlight argues that the veiled reference to possible collusion between Monteiro and Clinton was wholly immaterial and deliberately inflammatory. We find no abuse of discretion. *See Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir.1996).

Monteiro testified on redirect examination that he asked Conde to sign the August 15, 1988, statement in three places for Conde's own "protection," to prevent its alteration after it left Monteiro's possession. Later in his testimony, however, Monteiro admitted that he himself had given the statement directly to Thomas Clinton, Esquire, Starlight's counsel. When asked whether he had known Clinton well prior to August 1988, Monteiro acknowledged that they were on a "first-name basis," and had worked together previously.

■ We normally presume that a jury follows instructions to disregard improper argumentation. *See Greer v. Miller*, 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987); *Sweeney v. Westvaco Co.*, 926 F.2d 29, 36 (1st Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991). So it is here. After Clinton objected to the remark by Conde's counsel in closing argument, the court promptly cautioned the jury that the evidence did not establish a "friendship" between Monteiro and Clinton.

Moreover, Monteiro's *business relationship* with Clinton was in evidence. Finally, the Monteiro–Clinton relationship was at least somewhat probative of the plausibility of Monteiro's testimony concerning why he considered it necessary that Conde sign the August 15, 1988, statement in three places.

■ Second, Starlight relies on a closing remark to the effect that the captain's consumption of several alcoholic beverages as late as the evening meal the day of the accident had impaired his judgment, and likely explained his negligent refusal to slow the vessel and lower the net as Conde had requested. Although another fishing vessel captain testified that no vessel captain should consume alcohol while navigating a vessel, Starlight insists that it was necessary for Conde to adduce expert toxicological evidence as to how the particular level of alcohol consumption established by the evidence typically would impair human judgment.

The authorities cited by Starlight simply stand for the thesis that expert toxicological testimony *may* be used to establish the likely effects of alcohol. *See Armand v. Louisiana Power & Light Co.*, 482 So.2d 802, 804 (La. App.Ct.1986) ("[A]ll experts agreed that .30% or .23% [blood alcohol] would impair the motor abilities and judgment of anyone."); *see also People v. Modesto*, 66 Cal.2d 695, 59 Cal.Rptr. 124, 126, 427 P.2d 788, 790, *cert. denied*, 389 U.S. 1009, 88 S.Ct. 574, 19 L.Ed.2d 608 (1967), *overruled on other grounds, Maine v. Superior Court*, 68 Cal.2d 375, 66 Cal.Rptr. 724, 729 n. 8, 438 P.2d 372, 377 n. 8 (1968). These authorities in no manner suggest that such testimony is invariably required. *Cf., e.g., United States v. Hillsberg*, 812 F.2d 328, 333 (7th Cir.) ("The jury would likely have little knowledge of the effects of mental diseases and defects. Laymen do have occasion, however, to learn the effects of alcohol."), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987).

■ Third, Starlight contends that repeated references to Monteiro as an "adjust-

---

2. Since we deny Starlight's appeal, we need not reach Conde's contingent cross-appeal from the district court order granting Starlight's first motion for new trial. We assume that Conde would opt for a reduced total remittitur of $364,736, rather than reinstatement of the first jury award (i.e., $350,000).

er," during direct and redirect examination and in closing remarks by Conde's counsel, violated Federal Evidence Rule 411 ("Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully."). We do not agree.

For one thing, Starlight did not object to Conde's repeated references to Monteiro as an "adjuster" throughout either the first or second trial. Thus, the tardiness of its objection calls into serious question whether the litigants, let alone the jury, inferred that Monteiro was an *"insurance* adjuster," *cf., e.g., NLRB v. International Bhd. of Elec. Workers Local 340,* 481 U.S. 573, 581, 107 S.Ct. 2002, 2008, 95 L.Ed.2d 557 (1987) (union's "grievance adjuster or collective bargainer"); *Ferguson v. Skrupa,* 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963) ("debt adjuster"), let alone that Starlight carried liability insurance. In all events, Rule 411 does permit mention of insurance coverage, not to prove negligence, but collaterally to show the possible "bias or prejudice of a witness." *See Pinkham v. Burgess,* 933 F.2d 1066, 1072 (1st Cir.1991) ("Rule 411 itself contemplates that evidence that the defendant was insured may be admissible on issues other than negligence."); *Charter v. Chleborad,* 551 F.2d 246, 248 (8th Cir.) ("[T]he fact that defendant's insurer employed [a witness] was clearly admissible to show possible bias of that witness."), *cert. denied,* 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 128 (1977). Starlight's entire defense centered on Monteiro's credibility in regard to the authenticity of his "translation" of Conde's August 15, 1988 statement.

■ Finally, Starlight argues that Conde's attorney once again argued facts not in evidence, and invited the jury to engage in rank speculation, by noting that the captain might have been steaming the ALENTEJO full speed ahead in an attempt to flee Canadian waters before Canadian patrol boats detected the vessel. On the contrary, according to Starlight's own expert, based on a reverse extrapolation of its known course immediately after the accident, the ALENTEJO probably had been on the Canadian side of the Hague Line just prior to the accident. This circumstantial evidence combined powerfully with the captain's own testimony that he previously served aboard a fishing vessel seized by a Canadian patrol boat and that he knew on August 13, 1988 that the same Canadian patrol boat was within one-half mile of the ALENTEJO.

## II. *The Remittitur*

■ Starlight claims that the trial court miscalculated the remittitur at $254,212.50.[3] Starlight first projects a total future economic loss as low as $27,199, by using Conde's 1987 income, rather than the higher 1988 income figure, for arriving at a base annual salary. As Conde was injured in mid-August, 1988, however, the jury reasonably could have looked to Conde's higher 1988 income projection as a more accurate reflection of his future earning power than the 1987 income. *See Eastern Mountain Platform Tennis, Inc. v. Sherwin–Williams Co.,* 40 F.3d 492, 502 (1st Cir.1994) (in ruling on remittitur motion, court examines evidence "in the light most favorable to the prevailing party"); *see also Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 538, 103 S.Ct. 2541, 2551, 76 L.Ed.2d 768 (1983) ("It is both easier and more precise to discount the entire lost stream of earnings back to the date of injury—the moment from which earning capacity was impaired.").[4]

■ Starlight next argues that the 3% per annum adjustment for inflation in "non-agricultural" workers' wages from 1988 to 1995 (*i.e.,* 20.25% in aggregate) was excessive be-

---

3. Once a district court has decided to exercise its discretion to grant a remittitur, appellant "must show ... that the reduced figure remains so extravagant as to shock the appellate conscience." *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 724 (1st Cir.1994).

4. Although Conde earned $35,930 in gross income during 1987, he incurred extraordinary unreimbursed work expenses ($19,404) which effectively reduced his annual income to only $16,526. *See Jones & Laughlin,* 462 U.S. at 534, 103 S.Ct. at 2549 (recommending that unreimbursed work expenses be deducted before estimating future lost stream of income). This figure is substantially lower than Conde's projected 1988 gross income of $22,332. *See infra* note 7.

cause a commercial fisherman would not be classified as a "non-agricultural worker" and recent federal restrictions upon commercial fishing on Georges Bank have depressed fishermen's wages. Starlight offers no evidentiary support for its contention that a commercial fisherman would not qualify as a "non-agricultural" worker (*i.e.*, one who does not cultivate land) for purposes of the 1995 Economic Report of the President, which the parties otherwise stipulated as a source of the applicable "non-agricultural" inflation rate. Nor did Starlight adduce any evidence as to how its suggested offset to the stipulated inflation rate should be calculated. We therefore conclude that it has failed to demonstrate any "conscienceshocking" adjustment in calculating an inflation rate. *See supra* note 3.

Finally, Starlight argues that the trial court used the $118,500 jury award for past economic loss to calculate the relevant "base year" salary (*i.e.*, Conde's lost income for 1995) with which to extrapolate his future (*i.e.*, post–1995) economic loss, rather than predicating the base figure calculation directly on the trial evidence.[5] Although neither we nor the parties have been able to reconstruct the exact mathematical calculations utilized by the district court,[6] the trial evidence, viewed in the light most favorable to Conde, would yield an approximate discounted future economic loss of $196,236.[7]

■ The unknowable and unquantifiable factors involved in calculating a future stream of lost income (*e.g.*, future inflation rates; actual work life), militate against "a search for 'delusive exactness,'" since "[i]t is perfectly obvious that the most detailed inquiry can at best produce an approximate result." *Jones & Laughlin*, 462 U.S. at 546, 552, 103 S.Ct. at 2555, 2558. Even viewing the trial evidence most generously to Conde, however, the $254,212.50 award for future

5. The court explained its methodology as follows:
   In determining the figure to which to remit the award for loss of future earning capacity, I shall endeavor to arrive at the maximum figure which the jury could have awarded using as a guide the amount the jury awarded the plaintiff for lost wages from the date of the accident to the date of the verdict, i.e., $118,500. For this purpose, I shall assume the jury, in arriving at the $118,500 figure, deducted an amount for what was earned and what could have been earned after the plaintiff reached an end medical result. I shall also take into account the fact that the wages of non-agricultural workers from 1988 to 1995 rose approximately 3% a year or 20.25% over the entire period. After making these adjustments, what results is a figure of expected earnings for 1995 in the amount of $29,020. I shall then apply a reduction of 20% for taxes and a 1% discount rate to arrive at the amount the plaintiff would have earned over the 26 year period of his work expectancy reduced to present value. Using this methodology, the result is $254,212.[50]. (Footnotes omitted.)

6. As future loss calculations are multiplex, effective appellate review may be greatly inhibited by any lack of particularity in the trial court's methodology. Given these latent ambiguities, we could remand to the district court for clarification, *see Jones & Laughlin*, 462 U.S. at 546, 552, 103 S.Ct. at 2555, 2558 (refusing invitation to adopt one calculation methodology as "the exclusive method"), but for reasons of judicial economy we opt to calculate the maximum future economic loss based directly on the evidence before the jury. *See infra* note 7.

7. Viewing the evidence most favorably to Conde, the alternative remittitur amounts would work out as follows:

| | | |
|---|---|---|
| Annual gross income from 1/88 to 8/88 | | $ 14,106 |
| Extrapolated income from 8/88 to 12/88 | + | 8,816 |
| Unreimbursed work expenses | - | 590 |
| Total projected gross income for 1988 | | 22,332 |
| Inflation rate between 1988–95 (20.25) | + | 4,522 |
| Adjusted projected annual gross income (1995) | | 26,854 |
| Actual gross income for factory job (1995) | - | 15,080 |
| Total loss of annual gross income (1995) | | 11,774 |
| Taxes on lost income (@ 1988 rate of 16.97%) | - | 1,998 |
| Net annual lost income (1995) | | 9,776 |
| Remaining work life in 1995 (26 years) | x | 26 |
| Total lost future income stream | | 254,176 |
| | | |
| Discounted to present value (@ 1%) | | 196,236 |
| Discounted to present value (@ 2%) | | 151,890 |
| Discounted to present value (@ 3%) | | 117,860 |

Although the $254,212.50 remittitur calculated by the district court purportedly factored in a 1% discount rate, *see infra* note 8, it actually approximates our *pre*-discount amount of $254,176.

economic loss effectively disregards a significant and practicably quantifiable factor: the need to reduce future economic loss to present value, even if only by the most conservative discount figure (1%), *see supra* note 7, particularly since the parties *stipulated* below that some "present value" reduction would be appropriate, albeit reserving the precise discount rate (1% or 2%). *Cf. id.* at 548, 103 S.Ct. at 2556 (noting that use of discount rate between 1% and 3% in Jones Act case would not be an abuse of discretion).[8]

### III. *Conclusion*

■ Given these somewhat less "elusive" circumstances, we conclude that the 30% discrepancy between the $254,212.50 and the $196,236 economic-loss figures is sufficiently quantifiable and substantial that it ought not stand. *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 724 (1st Cir.1994); *cf. Jones & Laughlin,* 462 U.S. at 552, 103 S.Ct. at 2558 (noting that jury awards for pain and suffering are "highly impressionistic"); *Ruiz v. Gonzalez Caraballo,* 929 F.2d 31, 34 (1st Cir.1991) ("After all, '[t]ranslating legal damage [*viz.,* physical effects of post-traumatic stress syndrome] into money damages—especially in cases which involve few significant items of measurable economic loss—is a matter peculiarly within a jury's ken.'") (quoting *Wagenmann v. Adams,* 829 F.2d 196, 215 (1st Cir.1987)). Accordingly, we direct a further remittitur. *See Kolb v. Goldring, Inc.,* 694 F.2d 869, 875 (1st Cir.1982) (appellate court may order a new trial, in the event claimant rejects further remittitur, where trial court error in calculating remittitur was clear and mere "mechanical" correction is required) (citing *Stapleton v. Kawasaki*

---

**8.** Using a "market interest" rate (*e.g.,* 6%) to reduce a future-earnings award to present value recognizes that, at least in an inflation-free economy, the plaintiff's immediate accession to a lump-sum award would enable him to earn interest by reinvestment, an opportunity not available to him had the same amount been earned incrementally over time. *See Jones & Laughlin,* 462 U.S. at 537 n. 20, 103 S.Ct. at 2550 n. 20 ("present value" reduction premised on plaintiff's duty to mitigate damages). In an inflationary economy, however, a discount rate (or offset) below the "market interest" rate (*e.g.,* 1 or 2%, instead of 6%) may be used, because even though

*Heavy Indus.,* 608 F.2d 571, 574 n. 7 (5th Cir.1979)); *Everett v. S.H. Parks & Assocs., Inc.,* 697 F.2d 250, 253 (8th Cir.1983).

*The district court ruling denying defendant-appellant's motion for new trial is affirmed. The remittitur for future economic loss is further reduced to $196,236. Upon remand, the district court should fix an appropriate time within which plaintiff-appellee must either accept the revised remittitur or submit to a new trial on damages for future economic loss. The parties shall bear their own costs.*

*SO ORDERED.*

Conde did not adduce specific evidence from which to forecast actual inflation rates in future years, it nonetheless may be presumed that anticipated future inflationary trends will tend to curtail investment returns at levels below the market rate. *Id.* at 538–39, 103 S.Ct. at 2551–52. Although the Supreme Court has declined to mandate a single "present value" reduction or a single discount methodology for use in all Jones Act damages calculations, *see id.* at 550, 103 S.Ct. at 2557, absent extraordinary circumstances the factfinder normally should essay *some* measure of "present value" reduction.